No. 17-1960

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

In re: KBR, INCORPORATED, Burn Pit Litigation

-------------------------------

## ALAN METZGAR, *et al.*,

*Plaintiffs-Appellants,*

v.

## KBR INCORPORATED, *et al.*,

*Defendants-Appellees.*

*On Appeal from the United States District Court
for the District of Maryland at Greenbelt*

## PETITION FOR REHEARING *EN BANC*

Stephen I. Vladeck
727 East Dean Keeton Street
Austin, TX 78705
512-475-9198

Susan L. Burke
LAW OFFICES OF SUSAN L. BURKE
1611 Park Avenue
Baltimore, MD 21217
410-733-5444

Frederick C. Baker
Lisa Marie Saltzburg
James W. Ledlie
MOTLEY RICE, LLC
28 Bridgeside Boulevard
Mt. Pleasant, SC 29464
843-216-9000

*Counsel for Appellants*

July 3, 2018

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ............................................................... ii

I.  THE PANEL INCORRECTLY APPLIED THE FIRST *TAYLOR* FACTOR ........................ 1

II. IF THE PANEL OPINION IS NOT INCONSISTENT WITH *TAYLOR*, THEN
    *TAYLOR* SHOULD BE RECONSIDERED ................................................. 5

    a.  These Cases Do Not Implicate Any of the *Baker v. Carr*
           Factors ..................................................................... 7

        1.  "Textually Demonstrable Commitment" ...................................... 8

        2.  "Judicially Manageable Standards" ........................................ 10

        3.  "Respect Due Coordinate Branches" ........................................ 12

    b.  The Nuanced Litigation That *Taylor* Contemplates Defeats the
           Purpose of the Political Question Doctrine ................................. 12

    c.  These Cases Are a Suitable Vehicle for Revisiting *Taylor* ................ 14

# TABLE OF AUTHORITIES

**Page(s)**

**Cases:**

*Al Shimari v. CACI Premier Tech., Inc.*,
840 F.3d 147 (4th Cir. 2016) ("*Al Shimari IV*")....................................*passim*

*Am. K-9 Detection Servs., LLC v. Freeman*,
No. 15-932, 2018 WL 3207134 (Tex. June 29, 2018) ...................................7

*Baker v. Carr*,
369 U.S. 186 (1962)..........................................................................6, 8, 12

*Carmichael v. KBR Servs., Inc.*,
572 F.3d 1271 (11th Cir. 2009) ........................................................6, 8, 9, 14

*Cohens v. Virginia*,
19 U.S. (6 Wheat.) 264 (1821) ......................................................................5

*El-Shifa Pharm. Indus. Co. v. United States*,
607 F.3d 836 (D.C. Cir. 2010).......................................................................5

*Feres v. United States*,
340 U.S. 135 (1950)............................................................................10, 11

*Gilligan v. Morgan*,
413 U.S. 1 (1973)......................................................................................10

*Hamdi v. Rumsfeld*,
296 F.3d 278 (4th Cir. 2002) .........................................................................8

*Hamdi v. Rumsfeld*,
542 U.S. 507 (2004).....................................................................................8

*Harris v. KBR Servs., Inc.* ("*Harris II*"),
724 F.3d 458 (3d Cir. 2013) ...................................................................6, 7, 12

*Hercules Inc. v. United States*,
516 U.S. 417 (1996).....................................................................................11

*In re KBR, Inc., Burn Pit Litig.*,
744 F.3d 326 (4th Cir. 2014) ("*Burn Pit III*") .............................................1, 13

*In re KBR, Inc., Burn Pit Litig.*,
No. 17-1960, 2018 WL 3041083 (4th Cir. June 20, 2018)
("*Burn Pit V*") .........................................................................................*passim*

*Japan Whaling Ass'n v. American Cetacean Soc'y*,
    478 U.S. 221 (1986).......................................................................13

*KBR, Inc. v. Metzgar*,
    135 S. Ct. 1153 (2015)..................................................................14

*Lane v. Halliburton*,
    529 F.3d 548 (5th Cir. 2008) .........................................................6

*Latif v. Obama*,
    677 F.3d 1175 (D.C. Cir. 2012).....................................................9

*McManaway v. KBR, Inc.*,
    554 F. App'x 347 (5th Cir. 2014) ............................................7, 11

*Stencel Aero Eng'g Corp. v. United States*,
    431 U.S. 666 (1977)......................................................................11

*Taylor v. Kellogg Brown & Root Servs., Inc.*,
    658 F.3d 402 (4th Cir. 2011) ...............................................*passim*

*Zaidan v. Trump*,
    No. 17-581, 2018 WL 2976006 (D.D.C. June 13, 2018) ...............9

*Zivotofsky ex rel Zivotofsky v. Clinton* ("*Zivotofsky I*"),
    566 U.S. 189 (2012)...........................................................5, 11, 12


**Statutes & Other Authorities:**

28 U.S.C. § 2680(j) ...........................................................................10

28 U.S.C. § 2680(k) ..........................................................................10

# I.    THE PANEL INCORRECTLY APPLIED THE FIRST *TAYLOR* FACTOR

Under *Taylor* v. *Kellogg Brown & Root Servs., Inc.*, 658 F.3d 402 (4th Cir. 2011), "a suit against a military contractor presents a political question if the military exercised direct control over the contractor" with respect to the contractor's allegedly tortious activities. *In re KBR, Inc., Burn Pit Litig.*, No. 17-1960, 2018 WL 3041083, at *7 (4th Cir. June 20, 2018) ("*Burn Pit V*") (citing *Al Shimari* v. *CACI Premier Tech., Inc.*, 840 F.3d 147, 156 (4th Cir. 2016) ("*Al Shimari IV*")). "To qualify as direct control, the military's control over the government contractor must be plenary and actual." *Id.* (citations omitted). In other words, the military must clearly have chosen how the contractor was to carry out the allegedly tortious activities, and must in fact exercise that control. *See id.* at *7–8; *see also Al Shimari IV*, 840 F.3d at 156–57; *In re KBR, Inc., Burn Pit Litig.*, 744 F.3d 326, 338 (4th Cir. 2014) ("*Burn Pit III*"). Like the district court, the panel in this case misapplied *Taylor*, *Burn Pit III*, and *Al Shimari IV* by finding a political question despite substantial record evidence demonstrating that the military exercised neither plenary nor actual control with regard to the central claim at the heart of this litigation—not that KBR used burn pits *at all*, but that they were used inappropriately to dispose of hazardous materials.

The panel acknowledged the district court's finding that the evidence established that "the military determined that hazardous materials were 'to be

segregated and disposed of by a method *other* than surface burning' and '*not*
authorized to be placed in burn pits.'" *Burn Pit V*, 2018 WL 3041083, at *3
(emphases added). Yet the panel held that the district court did not clearly err when
it wholly discounted both the evidence (sworn declarations) and the allegations in
the complaint—distinguishing *Al Shimari IV* because that case involved "extensive
findings of systematic violations," whereas the Servicemembers here made only
"vague allegations" about hazardous materials being disposed via the burn pits.

   The panel's decision cannot be squared with the evidentiary record, which
establishes that KBR burned batteries and other hazardous materials in burn pits on
*thousands* of instances. At the district court's direction, the Servicemembers filed
individual declarations that described the substances they saw burning in the pits.
These declarations include the following specifics: (1) the name of the base where
KBR used surface burning to dispose of hazardous materials, (2) the dates on
which each witness was deployed to the base where the burn pit was located and
the circumstances associated with the observation of the burning (*e.g.*, walked by it
daily, jogged by it weekly, etc.), and (3) the names of the hazardous substances
that KBR burned in the burn pit.[1]

---

[1] The district court ordered the submission of these declarations on two
different occasions.  First, the Court ordered the Servicemembers to submit
declarations in response to KBR's objection that the Servicemembers' claims were
too vague. Dkt. Nos. 118–21, 125–26, 129–33, 135–36, 157, 168–72, 174–76,
178, 184, 193–94, 203, 207.  Second, the Court ordered the Servicemembers to

Given that 181 Servicemembers filed declarations both in 2011 and 2016, and another 525 Servicemembers filed declarations in 2016, the evidentiary record establishing KBR's systemic burning of hazardous material is substantial and robust. The panel's contrary description of the Servicemembers' claim as based on "isolated" instances suggests that the panel simply accepted the district court's clearly erroneous portrayal of the record at face value, without considering the actual evidence. And the panel also apparently accepted the district court's cryptic rejection of Kevin Robbins' testimony about working as a KBR burn-pit operator and repeatedly burning hazardous waste without any military direction. It is, in fact, impossible to review the record and conclude that there were only a "few instances" of KBR burning hazardous waste. Rather, taken as a whole, the record establishes that KBR violated military directives and burned hazardous materials on hundreds of days.

The panel's desultory review of the record is all the more problematic because KBR did not rebut this evidence with contradictory submissions. Instead, KBR's contract manager (David Palmer) admitted that hazardous materials should not have been burned, and testified that KBR was permitted to burn general waste but not hazardous materials. Mr. Palmer testified that KBR did not obtain military

respond to KBR's interrogatory seeking additional details about the burning. This resulted in the filing on the docket of 525 additional declarations. Dkt. Nos. 430, 432, 435, 437, and 445.

permission to burn paint, batteries, solvents, asbestos insulation, chemicals, hydraulic fluids, medical waste, petroleum products, oil, nuclear decontamination units, human corpses, human waste, pesticides, tires, and rubber. J.A. 3791–98. Nor did KBR produce any documentary evidence to contradict the witness testimony, such as the contemporaneous logs of substances burned (as required by the contract terms).

This record evidence thus establishes that KBR did not merely burn hazardous materials on a handful of isolated instances, but rather that it consistently ignored the military's directives and burned hazardous materials as a matter of course— thereby demonstrating that the military's control over KBR with regard to the allegedly tortious activities was neither plenary nor actual. *See Burn Pit IV*, 268 F. Supp. 3d at 806 ("[B]oth KBR's and Plaintiffs' witnesses testified that hazardous material was expected to be segregated and disposed of by a method other than surface burning."). Contra the panel, this case is thus on all fours with *Al Shimari IV*, because, as in that case, the record establishes that the allegedly tortious activities arose from a contractor's "systematic violations" wholly divorced from actual government control. *See* 840 F.3d at 157.

The panel should therefore have been bound by *Al Shimari IV* (to say nothing of *Taylor* itself) to conclude that this case does not meet the first *Taylor* factor. Rehearing or rehearing en banc is thus necessary to correct the panel's opinion,

and to reaffirm the inappropriateness of applying the political question doctrine to tort claims against private military contractors based upon an absence of plenary and actual government control.

## II.     IF THE PANEL OPINION IS NOT INCONSISTENT WITH *TAYLOR*, THEN *TAYLOR* SHOULD BE RECONSIDERED

If the political question doctrine, as construed by this court in *Taylor* and its progeny, nevertheless requires dismissal of a complaint in which substantial evidence demonstrates that a private military contractor committed torts beyond the scope of their government contract (and beyond the military's actual and plenary control), then the full court should reconsider whether *Taylor* is a proper construction of that doctrine in the first place.

"In general, the judiciary has a responsibility to decide cases properly before it, even those 'it would gladly avoid.'" *Zivotofsky ex rel Zivotofsky* v. *Clinton* ("*Zivotofsky I*"), 566 U.S. 189, 194–95 (2012) (quoting *Cohens* v. *Virginia*, 19 U.S. (6 Wheat.) 264, 404 (1821)). The political question doctrine is "a narrow exception to that rule." *Id*. at 195. Not only has the Supreme Court applied the doctrine sparingly, *see El-Shifa Pharm. Indus. Co.* v. *United States*, 607 F.3d 836, 856 (D.C. Cir. 2010) (en banc) (Kavanaugh, J., concurring in the judgment) ("The Court has relied on the doctrine only twice in the last 50 years."), it has *never* invoked it to bar a dispute between private parties—and for good reason. Insofar as the political question doctrine is "essentially a function of the separation of

powers," *Baker* v. *Carr*, 369 U.S. 186, 217 (1962), it is principally concerned with the courts' constitutional role vis-à-vis the political branches of government—not the imposition of liability against non-governmental actors. *See Harris* v. *KBR Servs., Inc.* ("*Harris II*"), 724 F.3d 458, 465 (3d Cir. 2013) ("Defense contractors do not have independent constitutional authority and are not coordinate branches of government to which we owe deference.").

In *Taylor*, this court nevertheless extended the political question doctrine to certain state-law tort suits against private military contractors for the first time, relying heavily on contemporaneous decisions to similar effect from the Fifth and Eleventh Circuits. Under *Taylor*, "a suit against a military contractor raises a nonjusticiable political question if either (1) the military exercised direct control over the contractor, or (2) 'national defense interests were closely intertwined with the military's decisions regarding [the contractor's] conduct.'" *Burn Pit V*, 2018 WL 3041083, at *6 (quoting *Taylor*, 658 F.3d at 411); *see also Carmichael* v. *KBR Servs., Inc.*, 572 F.3d 1271 (11th Cir. 2009); *Lane v. Halliburton*, 529 F.3d 548 (5th Cir. 2008).

In so holding, this court in *Taylor* followed its sister circuits down a doctrinal rabbit hole. Properly understood, claims like those at issue here are a poor fit for the categorical, litigation-barring medicine of the political question doctrine. *See,*

*e.g.*, *Harris II*, 724 F.3d at 465–66. That poor fit is reflected not only in the absence of any of the factors the Supreme Court associated with political questions in *Baker* and the detailed, fact-intensive inquiry courts must undertake before deciding whether it applies, but also in the significant variations in how different circuits and state courts have applied the doctrine to cases like these. *See McManaway* v. *KBR, Inc.*, 554 F. App'x 347, 349, 352 (5th Cir. 2014) (Jones, J., dissenting from the denial of rehearing en banc) ("[Among the circuit courts, there is no uniformity" as to "the cognizability of suits against contractors-on-the-battlefield."); *see also Am. K-9 Detection Servs., LLC* v. *Freeman*, No. 15-932, 2018 WL 3207134, at \*11 (Tex. June 29, 2018) (Guzman, J., dissenting) (noting the material distinctions between how appellate courts apply the political question doctrine to tort suits against private military contractors). Thus, if contra the analysis above, the panel opinion in this case is compelled by *Taylor* and its progeny, the en banc court should revisit—and reconsider—*Taylor*'s flawed analytical foundations.

> **a. These Cases Do Not Implicate Any of the *Baker* v. *Carr* Factors**

In *Taylor*, this court held that a state-law negligence suit brought by a servicemember against a private military contractor for injuries suffered from a severe electric shock was foreclosed by the political question doctrine. 658 F.3d at 411–12. *Taylor* concluded that the case satisfied the second and fourth of the six

*Baker* v. *Carr* factors—because it lacked judicially discoverable and manageable standards, and because independent resolution of the dispute would express a lack of the respect due to coordinate branches of government. *Id*. at 412 n.13. In *Carmichael*, the Eleventh Circuit also suggested that such suits implicated the first *Baker* factor by raising a claim the adjudication of which is textually committed to the political branches. 572 F.3d at 1281–83. On closer inspection, however, none of those three factors are actually implicated by state-law tort suits against private military contractors.

### 1. "Textually Demonstrable Commitment"

No constitutional provision commits the adjudication of tort suits against private military contractors—even those implicating "actual, sensitive judgments made by the military," *Taylor*, 658 F.3d at 411—to the political branches. Early in the *Hamdi* litigation (and nine years before *Taylor*), this court rejected the federal government's argument that the military detention of U.S. citizens captured on a foreign battlefield presented a non-justiciable political question, *see Hamdi* v. *Rumsfeld*, 296 F.3d 278, 283 (4th Cir. 2002), a conclusion that the Supreme Court reinforced on appeal. *Hamdi* v. *Rumsfeld*, 542 U.S. 507, 535 (2004) (plurality opinion) ("[W]e necessarily reject the Government's assertion that separation of powers principles mandate a heavily circumscribed role for the courts in such

circumstances."); *see also id*. at 541 (Souter, J., concurring in part, dissenting in part, and concurring in the judgment).

If no textually demonstrable commitment prevents federal courts from reviewing highly classified intelligence reports to ascertain whether a non-citizen terrorism suspect is properly subject to military detention, *see, e.g.*, *Latif* v. *Obama*, 677 F.3d 1175 (D.C. Cir. 2012), no similar commitment could divest federal courts of the power to adjudicate state-law tort suits against private defendants—whether they arose on the battlefield or off. *Cf. Zaidan* v. *Trump*, No. 17-581, 2018 WL 2976006 (D.D.C. June 13, 2018) (holding that the political question doctrine does not foreclose a U.S. citizen's challenge to the constitutionality of his alleged inclusion on a drone-strike "kill list").

Nor do the other circuit rulings on which *Taylor* relied identify such a textually demonstrable commitment. Instead, they each proceed from the flawed assumption that, because suits like these would present political questions if they were brought directly against the military, it must follow that they are similarly non-justiciable when private defendants are acting pursuant to government direction. *See, e.g.*, *Carmichael*, 572 F.3d at 1281–83. This reasoning is a non-sequitur. Tort claims against the military are not generally barred by the political question doctrine; instead, they typically encounter a series of distinct obstacles, foremost among them sovereign immunity—and the exceptions to the Federal Tort Claims Act for

torts committed in foreign countries, 28 U.S.C. § 2680(k); torts committed incident to combat activities, *id.* § 2680(j); or torts arising out of, or incident to, a servicemember's military service. *See Feres* v. *United States*, 340 U.S. 135 (1950). Whatever the scope of these more specific immunities and defenses, they would hardly be necessary if the Constitution exclusively committed the resolution of all such disputes to the political branches.[2]

## 2. "Judicially Manageable Standards"

Nor is it the case that tort suits against private military contractors present a lack of judicially discoverable or manageable standards. Certainly, whether specific conduct is reasonable under the circumstances will depend heavily upon the actual circumstances presented, but that goes to the analytical difficulty of resolving the claim, not the court's lack of competence to do so. *See, e.g.*, *Al Shimari IV*, 840 F.3d at 162 (courts should not "question[] the justiciability of a case merely because the case involves the need to define [vague] terms"). A case only presents a lack of judicially discoverable or manageable standards—and

---

2. *Gilligan* v. *Morgan*, 413 U.S. 1 (1973), underscores this conclusion. Although the Supreme Court there held that a lawsuit seeking to impose continuing judicial supervision over the training, weaponry, and standing orders of the Ohio National Guard presented a non-justiciable political question, it was clear that "we neither hold nor imply that the conduct of the National Guard is always beyond judicial review," *id.* at 11, and that the case would have presented "wholly different issues" if it had sought damages arising from a "particular factual setting." *Id.* at 14 (Blackmun, J., concurring).

thereby satisfies the second *Baker* factor—when it leaves courts "truly rudderless" in seeking to resolve plaintiffs' claims. *Zivotofsky I*, 566 U.S. at 204 (Sotomayor, J., concurring). There is nothing "truly rudderless" about ascertaining whether KBR's alleged misconduct rose to the level of tort liability.

To be sure, the apportionment of liability as *between* a private military contractor and the government may raise its own difficult factual and legal questions, but no more so than in any case in which any contractor seeks indemnification from the government for actions it claims the contract compelled—none of which have ever been deemed foreclosed by the political question doctrine, as opposed to immunity principles derived from *Feres*. *See, e.g.*, *Hercules Inc.* v. *United States*, 516 U.S. 417, 425–30 (1996); *Stencel Aero Eng'g Corp.* v. *United States*, 431 U.S. 666, 673 (1977). As for whether a private military contractor is actually liable for the alleged state-law torts, this court recently reiterated that a suit that "allege[s] familiar torts based on long-standing common law principles" does not present a political question—even if "the substantive law applicable to the present claims may be unfamiliar and complicated in many respects." *Al Shimari IV*, 840 F.3d at 161; *see also McManaway*, 554 F. App'x at 351 (Jones, J., dissenting from the denial of rehearing en banc) ("A negligence claim in any jurisdiction requires proof of the same elements: duty, breach, causation and damages.").

### 3. "Respect Due Coordinate Branches"

Nor would judicial resolution of state-law tort claims against private military contractors show a "lack of the respect due coordinate branches of government." *Baker*, 369 U.S. at 217. As the Third Circuit has explained, "[d]efense contractors . . . are not coordinate branches of government to which we owe deference." *Harris II*, 724 F.3d at 465. But even if such deference could be justified by the government's background involvement, the "lack of respect" with which the Court was concerned in *Baker* involved circumstances in which courts were asked to second-guess internal deliberative decisions made by the political branches, not whether private parties, whatever their relationship with the government, engaged in tortious activity. *See, e.g.*, *Zivotofsky I*, 566 U.S. at 207 (Sotomayor, J., concurring). To that end, "it will be the rare case in which *Baker*'s final factors alone render a case nonjusticiable." *Id.* State-law tort suits against private military contractors are not such rare disputes.

### b. The Nuanced Litigation That *Taylor* Contemplates Defeats the Purpose of the Political Question Doctrine

That claims such as those at issue here are a poor fit for the political question doctrine is illustrated by the volume of litigation required to reach even whether *Taylor* properly applies in the first place. As the Third Circuit explained in *Harris II*, "when deciding whether a case presents a political question, we rarely need to look beyond the complaint and any of its obvious implications. This is not so with

complaints against defense contractors." 724 F.3d at 465. Instead, under *Taylor*, "courts must apply a particularly discriminating inquiry into the facts and legal theories making up the plaintiff's claims as well as the defendant's defenses." *Id*. at 466; *see also Lane*, 529 F.3d at 565.

The procedural history of this case underscores exactly how much litigation such a "discriminating inquiry" can necessitate. In *Burn Pit III*, this court reversed the district court's dismissal of plaintiffs' complaints because "the record was not sufficiently developed to support the district court's decision." *Burn Pit V*, 2018 WL 3041083, at *1. But even the limited jurisdictional discovery that ensued took well over two years to complete, culminating in the production of over 5.8 million pages of documents and in 34 witness depositions. *See id*. at *2. It is difficult to reconcile the theory of political questions—a category of legal decisions that "the Judiciary is particularly ill suited to make," *Japan Whaling Ass'n* v. *American Cetacean Soc'y*, 478 U.S. 221, 230 (1986)—with a doctrinal application that can require a district court to undertake years of exhaustive, fact-intensive, and time-consuming litigation (to say nothing of the interlocutory appeals that will inexorably follow) before it can ascertain whether or not the case at hand is, after all, not "justiciable."

In unsuccessfully asking the Supreme Court to review this court's decision in *Burn Pit III*, KBR argued that this court's "merits-based approach to the political

question doctrine" was in conflict with the Eleventh Circuit's framework as articulated in *Carmichael*. *See* Petition for a Writ of Certiorari at 26, *KBR, Inc.* v. *Metzgar*, 135 S. Ct. 1153 (2015) (mem.) (No. 13-1241). In fact, what the "merits-based approach" truly demonstrates is the extent to which *Taylor*, like *Carmichael*, is in conflict with the political question doctrine itself.

### c.  These Cases Are a Suitable Vehicle for Revisiting *Taylor*

Finally, these cases present an appropriate vehicle for revisiting *Taylor*. The panel decision reached and resolved the case based solely upon the conclusion that the political question doctrine bars the plaintiffs' claims, and specifically declined to reach—and vacated as moot—the district court's alternative holding that "the FTCA's combatant activities exception preempted the [plaintiffs'] claims." *Burn Pit V*, 2018 WL 3041083, at *10. The panel or en banc court could certainly conclude that the panel's application of *Taylor* was incorrect, *see supra* Part I. But if it is not, and if the political question doctrine as interpreted by this circuit bars state-law tort suits against private military contractors even for torts that had so little connection to actual and plenary military control, this court should rehear this case to reconsider such an expansive—and analytically unjustified—precedent.

Respectfully submitted,


/s/ Susan Burke
Susan L. Burke
LAW OFFICES OF SUSAN L. BURKE
1611 Park Avenue
Baltimore, MD 21217
(410) 733) 5444

Frederick C. Baker
Lisa Marie Saltzburg
James W. Ledlie
MOTLEY RICE, LLC
28 Bridgeside Boulevard
Mt. Pleasant, SC 29464
(843) 216-9000

Stephen I. Vladeck
727 East Dean Keeton Street
Austin, TX  78705
(512) 475-9198


*Counsel for Appellants*

**UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT**
**Effective 12/01/2016**

No. 17-1960       **Caption:** Alan Metzgar, et al. v. KBR, Inc.

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT
Type-Volume Limit, Typeface Requirements, and Type-Style Requirements

---

**Type-Volume Limit for Briefs:** Appellant's Opening Brief, Appellee's Response Brief, and Appellant's Response/Reply Brief may not exceed 13,000 words or 1,300 lines. Appellee's Opening/Response Brief may not exceed 15,300 words or 1,500 lines. A Reply or Amicus Brief may not exceed 6,500 words or 650 lines. Amicus Brief in support of an Opening/Response Brief may not exceed 7,650 words. Amicus Brief filed during consideration of petition for rehearing may not exceed 2,600 words. Counsel may rely on the word or line count of the word processing program used to prepare the document. The word-processing program must be set to include headings, footnotes, and quotes in the count. Line count is used only with monospaced type. See Fed. R. App. P. 28.1(e), 29(a)(5), 32(a)(7)(B) & 32(f).

---

**Type-Volume Limit for Other Documents if Produced Using a Computer:** Petition for permission to appeal and a motion or response thereto may not exceed 5,200 words. Reply to a motion may not exceed 2,600 words. Petition for writ of mandamus or prohibition or other extraordinary writ may not exceed 7,800 words. Petition for rehearing or rehearing en banc may not exceed 3,900 words. Fed. R. App. P. 5(c)(1), 21(d), 27(d)(2), 35(b)(2) & 40(b)(1).

---

**Typeface and Type Style Requirements:** A proportionally spaced typeface (such as Times New Roman) must include serifs and must be 14-point or larger. A monospaced typeface (such as Courier New) must be 12-point or larger (at least 10½ characters per inch). Fed. R. App. P. 32(a)(5), 32(a)(6).

---

This brief or other document complies with type-volume limits because, excluding the parts of the document exempted by Fed. R. App. R. 32(f) (cover page, disclosure statement, table of contents, table of citations, statement regarding oral argument, signature block, certificates of counsel, addendum, attachments):

☑ this brief or other document contains _____3347_____ [*state number of*] words

☐ this brief uses monospaced type and contains _____ [*state number of*] lines

This brief or other document complies with the typeface and type style requirements because:

☑ this brief or other document has been prepared in a proportionally spaced typeface using
MS Word 2016_____ [*identify word processing program*] in
Times New Roman, 14 point_____ [*identify font size and type style*]; or

☐ this brief or other document has been prepared in a monospaced typeface using
_____ [*identify word processing program*] in
_____ [*identify font size and type style*].

(s) Susan L. Burke_____

Party Name appellants_____

Dated: 7/3/2018_____

# CERTIFICATE OF SERVICE

I certify that on 7/3/2018 _____ the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by serving a true and correct copy at the addresses listed below:

/s/ Susan L. Burke
_____
Signature

7/3/2018
_____
Date

<u>**PUBLISHED**</u>

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

─────────────

**No. 17-1960**

─────────────

In re:  KBR, INC., Burn Pit Litigation.

------------------------------

ALAN METZGAR, RWT 09-744; PAUL PARKER, and all others similarly
situated: RWT 09-744; JOSHUA ELLER, RWT 09-2748; JOANNE OCHS, RWT
09-2747; MELISSA OCHS, RWT 09-2747; JAMES MORGAN, RWT 09-2747;
DAVID NEWTON, RWT 09-2747; CHRIS BOGGIANO, RWT 09-2747; EARL
CHAVIS, RWT 09-2747; BENNY LYLE REYNOLDS, RWT 09-2747; ALBERT
PAUL BITTEL, III, RWT 09-2745; MICHAEL DOUGLAS MOORE, and all
others similarly situated: RWT 09-2742; DAVID U. LACKEY, RWT 09-2743;
RANDALL L. ROBINSON, and all others similarly situated: RWT 09-2743;
MICHAEL AUW, and all others similarly situated: RWT 09-2741; CORY
CASALEGNO, and all others similarly situated: RWT 09-2741; RICHARD
RONALD GUILMETTE, and all others similarly situated: RWT 09-2739;
WILLIAM G. BRISTER, JR., and all others similarly situated: RWT 09-2740;
HENRY J. O'NEILL, and all others similarly situated: RWT 09-2740; SMSGT
GLEN S. MASSMAN, and all others similarly situated: RWT 09-2750; SSGT
WENDY L. MCBREAIRTY, and all others similarly situated: RWT 09-2750;
DEAN GUY OLSON, and all others similarly situated: RWT 09-2744; ROBERT
CAIN, RWT 09-2749; CRAIG HENRY, RWT 09-2749; FRANCIS JAEGER,
RWT 09-2749; DAVID MCMENOMY, RWT 09-2749; MARK POSZ, RWT 09-
2749; EL KEVIN SAR, and all others similarly situated: RWT 09-2749;
MAURICE CALLUE, RWT 09-2980; DENNIS WAYNE BRIGGS, RWT 09-
2980; EDWARD LEE BUQUO, RWT 09-2980; WAYNE E. FABOZZI, RWT
09-2980; SHARLENE S. JAGGERNAUTH, RWT 09-2980; FLOYD JAMES
JOHNSON, SR., RWT 09-2980; TAMRA C. JOHNSON, RWT 09-2980;
RICHARD LEE KEITH, RWT 09-2980; DANIEL SANTIAGO MORALES,
RWT 09-2980; PHILLIP MCQUILLAN, RWT 09-2980; ILDEBBRANDO
PEREZ, RWT 09-2980; LUIGI ANTONIO PROVENZA, RWT 09-2980; RUTH
ANN REECE, RWT 09-2980; EDUARDO SAAVEDRA, SR., RWT 09-2980;
JILL R. WILKINS, personal representative of Kevin E. Wilkins, deceased: RWT
09-2980; MICHAEL DONNELL WILLIAMS, RWT 09-2980; JERMAINE
LYNELL WRIGHT, and all others similarly situated: RWT 09-2980; BENJAMIN

BOEKE, RWT 09-2984; CRAIG KERVIN, RWT 09-2984; BARRY ZABIELINSKI, RWT 09-2984; PABLO BERCHINI, RWT 09-2979; BRIAN P. ROBINSON, RWT 09-2979; DAVID GREEN, RWT 09-2985; NICK DANIEL HEISLER, RWT 09-2985; JOHN DOE, sued as John and Jane Does 1-1000 and all others similarly situated: RWT 09-2985; JOHN A. WESTER, JR., RWT 09-2987; EDWARD ADAMS, personally and as a class representative for all others similarly situated: RWT 09-2981; KENNETH BALDWIN, personally and as a class representative for all others similarly situated: RWT 09-2981; DONNA WU, personally and as a class representative for all others similarly situated: RWT 09-2981; JOHN DOES 1-1000, RWT 09-2981; JANE DOES 1-1000, RWT 09-2981; KENNETH PAUL ROBBINS, RWT 09-2983; BRIAN BLUMLINE, RWT 09-2983; ROBERT BIDINGER, RWT 09-2983; UNKNOWN PARTIES, named as "all others similarly situated": RWT 09-2983; DERROL A. TURNER, RWT 09-2986; VINCENT C. MOSELEY, RWT 09-2986; ALEX HARLEY, and all others similarly situated: RWT 09-2986; FRED ROBERT ATKINSON, JR., RWT 09-2746; ROBYN SACHS, personal representative of Christopher Sachs, deceased: RWT 09-2746; JENNIFER MONTIJO, RWT 09-2746; STEPHEN FLOWERS, and all others similarly situated: RWT 09-2746; WALLACE MCNABB, and all others similarly situated: RWT 09-2982; PATRICK CASSIDY, and all others similarly situated: RWT 09-3309; WILLIAM BARRY DUTTON, and all others similarly situated: RWT 09-3309; CHRISTOPHER MICHAEL KOZEL, and all others similarly situated: RWT 09-3309; CHARLES HICKS, RWT 09-3305; SEAN ALEXANDER STOUGH, and all others similarly situated: RWT 09-3305; BILL JACK CARLISLE, JR., and all others similarly situated: RWT 09-3299; ANTHONY EDWARD ROLES, and all others similarly situated: RWT 09-3299; DANNY LAPIERRE, Individually and all others similarly situated: RWT 09-2083; ANTHONY RAY JOHNSON, RWT 09-3313; DAVID MICHAEL ROHMFELD, RWT 09-3313; RICHARD MCANDREW, RWT 09-3310; LORENZO PEREZ, and all others similarly situated: RWT 09-3310; THOMAS KELLECK, RWT 09-3304; DAN BOWLDS, RWT 09-3304; TONY ALLEN GOUCKENOUR, RWT 09-3304; JOHN WILLIAM JACKSON, RWT 09-3304; JOHN PETE TROOST, RWT 09-3304; DEBORAH ANN WHEELOCK, and all others similarly situated: RWT 09-3304; GEORGE LUNDY, RWT 09-3303; EUNICE RAMIREZ, and all others similarly situated: RWT 09-3301; MARCOS BARRANCO, RWT 09-3300; JOEL LUGO, RWT 09-3300; SHAWN THOMAS SHERIDAN, RWT 09-3300; JAYSON WILLIAMS, and all others similarly situated: RWT 09-3300; HEINZ ALEX DISCH, RWT 09-3312; JAMES MCCOLLEM, RWT 09-3312; TRAVIS FIDELL PUGH, RWT 09-3312; THOMAS OLSON, RWT 09-3315; BRIAN PAULUS, RWT 09-3315; PAUL MICHAEL WIATR, and all others similarly situated: RWT 09-3315; LEE WARREN JELLISON, JR., RWT 09-3302; JESSEY JOSEPH PHILIP BACA, RWT 09-3311; DANIEL TIJERNIA, and all others similarly situated: RWT 09-3311; JOSHUA DAVID BEAVERS, RWT 09-3314; JOHN AND JANE DOES 1-

1000, RWT 09-3308; MATTHEW JOEL FIELDS, RWT 09-3314; MICHAEL FOTH, and all others similarly situated: RWT 09-3316; STEVEN E. GARDNER, RWT 09-3314; KENNETH HARRIS, RWT 09-3308; STEPHEN R. JONES, RWT 09-3314; BRETT ANTHONY MAZZARA, and all others similarly situated: RWT 09-3316; KEVIN SCOTT TEWES, RWT 09-3314; KATHY VINES, RWT 09-3308; ANTHONY JEROME WILLIAMS, RWT 09-3308; HANS NICOLAS YU, RWT 09-3314; JEFFREY MORGAN COX, and all others similarly situated: RWT 09-3306; JAMES WARREN GARLAND, and all others similarly situated: RWT 09-3306; PETER BLUMER, and all others similarly situated: RWT 10-389; SCOTT ANDREW CHAMBERLAIN, and all others similarly situated: RWT 10-389; TIMOTHY E. DIMON, and all others similarly situated: RWT 10-389; WILLIAM PHILIP KRAWCZYK, SR., and all others similarly situated: RWT 10-389; SEAN JOHNSON, and all others similarly situated: RWT 10-390; DAVID ROUNDS, Personal representative of Andrew Ray Rounds, deceased: RWT 10-388; LISA ROUNDS, Personal representative of Andrew Ray Rounds, deceased: RWT 10-388; ALBERT JOHNSON, JR., RWT 10-815; GENE BISHOP, RWT 10-814; PATRICK BISHOP, RWT 10-814; SHERRY BISHOP, Individually and as representative of the estate of Kirk A. Bishop: RWT 10-814; GENE MATSON; GENE LEONARD MATSON; TIMOTHY J. WATSON, RWT 10-1160; DAVID JOBES, RWT 10-836; BETH OSHIRO BURTON, RWT 10-3360; MICHELLE BROWN, RWT 11-336; JONATHAN LYNN, RWT 11-336; ANDREW MASON, RWT 11-336; CHARLES KINNEY, RWT 11-337; MICHAEL MCCLAIN, RWT 11-338; BASIL SALEM, RWT 11-1092; JUSTIN GONZALES, RWT 11-2634; MATTHEW GUTHERY, RWT 11-2635; CHRISTOPHER LIPPARD, RWT 11-2635; DAVID PARR, RWT 11-3292; JOHN FINBAR MONAHAN, RWT 11-3542; AMANDA BRANNON, RWT 12-3070; L. CHANDLER BRANNON, RWT 12-3070; ELIYAHU ARSHADNIA, RWT 13-1023, individually and on behalf of the marital community with Simcha Arshadnia; SIMCHA ARSHADNIA, RWT 13-1023, individually and on behalf of the marital community with Eliyahu Arshadnia; WILLIAM SIMMONS, RWT 13-1023, an individual; DAWN LUCIA, RWT 13-1023, individually and on behalf of the Estate of Joseph Lucia, deceased; DANIEL MEYER, RWT 13-1023, individually and on behalf of the marital community with Harmonie Meyer; HARMONIE MEYER, RWT 13-1023, individually and on behalf of the marital community with Daniel Meyer; JOSE BURGOS, RWT 13-1023, individually and on behalf of the marital community with Bethany Burgos; BETHANY BURGOS, RWT 13-1023, individually and on behalf of the marital community with Jose Burgos; STEPHEN HOPPER, RWT 13-1023, an individual; STEVEN C. SNEE, RWT 15-1568; VINCENT MOLINO, RWT 15-1568; LARRY ENGLE, RWT 15-1568; RAYMOND CRUZ, RWT 15-1568; ANTONIO CLARK, RWT 15-1568; JAMES KNOUSE, JR., RWT 15-1568; LESLIE SCOTT, RWT 15-1568; SCOTT HURT, RWT 15-1568; 176-459 JAMES JACKSON, RWT 15-1568; JEFFREY DURHAM, RWT 15-1568; WILLIAM AUSTIN DANIEL, RWT 15-1568,

deceased; JOSEPH COLLINS, RWT 15-1568; RACHEL GUTIERREZ, RWT 15-1568; BRANDON SHOEMAKE, RWT 15-1568; STACIE MOSER, RWT 15-1568; ALBERT ROBERTS, RWT 15-1568; JEFFREY WILKINS, RWT 15-1568; WILLIAM EATON, RWT 15-1568; TODD GRIMES, RWT 15-1568; GARY MORRIS, RWT 15-1568; MICHAEL GENAW, RWT 15-1568; JOSHUA KEPPLE, RWT 15-1568; WILLIS ROWE; JUSTIN ACOSTA, RWT 15-3836; TRAVIS ADAMS, RWT 15-3836; LEON J. ALEXANDER, RWT 15-3836; MICHAEL DEVINCENT AMICY, RWT 15-3836; THOMAS ANDERSEN, RWT 15-3836; PATTI J. ANDERSON, RWT 15-3836; PHILLIP A. ANDERSON, RWT 15-3836; DOMINICK THOMAS ANDREWS, RWT 15-3836; JULIO A. APODACA, RWT 15-3836; ROSE MARIE APPLEWHITE, RWT 15-3836; FRANCISCO ARAQUE, RWT 15-3836; ANTHONY L. ARRINGTON, RWT 15-3836; TRACY L. ASHER, RWT 15-3836; MATTHEW K. ASHWORTH, RWT 15-3836; RYAN L. ATTAR, RWT 15-3836; DUSTIN JEFFREY AUER, RWT 15-3836; EVERETTE D. AVERY, JR., RWT 15-3836; JOHN ALAN BACON, RWT 15-3836; SCOTT D. BAILEY, RWT 15-3836; JESSE BAKER, RWT 15-3836; LARRY BAKER, RWT 15-3836; STEVEN LEROY BAKKEN, RWT 15-3836; MICHAEL DANIEL BANKS, RWT 15-3836; ANGELA VANETTE BARNES, RWT 15-3836; CHARLES J. BARNES, RWT 15-3836; JULIE BARON-MANNIX, RWT 15-3836; TRAVIS M. BASSETT, RWT 15-3836; JAMES R. BATES, RWT 15-3836; JERICHO N. BEAUCHAMP, RWT 15-3836; CRAIG BELANGER, RWT 15-3836; JUDY-ANN BELLEFLEUR, RWT 15-3836; REGINALD J. BELTON, RWT 15-3836; BRANDI L. BENSON, RWT 15-3836; THEODORE J. BILL, RWT 15-3836; JASON R. BILLS, RWT 15-3836; JOHNNIE F. BINES, RWT 15-3836; DENNIS A. BLANCHARD, RWT 15-3836; CLINT ALLEN BLANKENSHIP, RWT 15-3836; ANDREW MICHAEL BOOTH, RWT 15-3836; BRIAN K. BOWER, RWT 15-3836; ANDREW DOULGAS BOWERS, SR., RWT 15-3836; WILLIE ANTONIO BOYKIN, SR., RWT 15-3836; FRANK EARL BRAXTON, RWT 15-3836; ALAN K. BRIDGEWATER, RWT 15-3836; BRANDY E. BROADBENT, RWT 15-3836; RACHAEL BROWN, RWT 15-3836; DAVID F. BRYDEN, RWT 15-3836; DENNIS H. BUDD, RWT 15-3836; ERIK J. BURCH, RWT 15-3836; KENON L. BURNS, RWT 15-3836; THOMAS W. BURNS, RWT 15-3836; TEE JAY BURR, RWT 15-3836; ROBERT P. BUSSE, RWT 15-3836; MICHAEL L. CALDWELL, RWT 15-3836; WILLIAM G. CARDWELL, RWT 15-3836; JOHN ERNEST CARLSON, RWT 15-3836; JASON L. CARMEN, RWT 15-3836; MICHAEL W. CARR, RWT 15-3836; ROBIN A. CARR, RWT 15-3836; ANDREA M. CASTON, RWT 15-3836; FREDDIE E. CAVAZOS, JR., RWT 15-3836; RICHARD D. CELIA, RWT 15-3836; BLAIN L. CHAMBERS, RWT 15-3836; BRUCE R. CHAPLIN, RWT 15-3836; DANIEL C. CHAVEZ, SR., RWT 15-3836; LEONARD RAY CHEEK, RWT 15-3836; GWEN COLLEEN CHIARAMONTE, RWT 15-3836; BLAINE S. CHILD, RWT 15-3836; KENNETH ROGER CHRISTENSEN, SR., RWT 15-3836; SCOTT ALLAN

4

CHRISTIE, RWT 15-3836; MARC J. CHUBBUCK, SR., RWT 15-3836;
RICHARD CHARLES CHUMBLEY, JR., RWT 15-3836; JEFFREY S.
CHURCH, RWT 15-3836; DERRICK D. CLARK, RWT 15-3836; RICHARD
MICHAEL CLEMES, RWT 15-3836; RYAN V. COLLAMORE, RWT 15-3836;
CONNIE G. CONLEY, RWT 15-3836; ANDREW E. COUSSENS, RWT 15-
3836; KATHLEEN S. COY, RWT 15-3836; CHARLES DONALD CRABBE,
JR., RWT 15-3836; MICHAEL A. CRANFILL, RWT 15-3836; PERRY A.
CROSS, JR., RWT 15-3836; CRAIG J. DANIEL, RWT 15-3836; ROWENA L.
DARVIN, RWT 15-3836; JESSE N. DAVIDSON, RWT 15-3836; BRITTANY J.
DAVIS, RWT 15-3836; DANIEL LEE DAVIS, RWT 15-3836; MALONE W.
DAVIS, RWT 15-3836; RYAN MARTIN DELONG, RWT 15-3836; DAVID
BRIAN DELUCA, RWT 15-3836; MICHAEL S. DELBORRELL, RWT 15-3836;
JOSEPH EDWARD DEVALL, RWT 15-3836; SHAWN R. DEVANEY, RWT
15-3836; FREDERICK A. DEVONSHIRE, II, RWT 15-3836; MICKY DOTO,
RWT 15-3836; JENNIFER L. DOWNES, RWT 15-3836; BRADLEY DOYLE,
RWT 15-3836; ROBERT A. DREYFUS, RWT 15-3836; NICHOLAS R.
DUDEK, JR., RWT 15-3836; JOHN G. DUERR, RWT 15-3836; BONNIE
DUNLOP, RWT 15-3836; BRIAN EARL EASLEY, RWT 15-3836; MICHAEL
S. EDDY, RWT 15-3836; THOMAS S. EDWARDS, RWT 15-3836; RONALD
EYRL EISMAN, RWT 15-3836; ROBERT CHRISTOPHER ELESKY, RWT 15-
3836; JAMES COREY ELLIS, RWT 15-3836; EARNEST J. ELLISON, RWT
15-3836; SCOTT A. ELSENHEIMER, RWT 15-3836; AMANDA J. ENGEN,
RWT 15-3836; GARY LEE ENNIS, RWT 15-3836; TREVOR G. ENNIS, RWT
15-3836; CASSANDRA D. EUSERY, RWT 15-3836; TERRY D. EVANS, RWT
15-3836; JUSTIN M. FAIRCLOTH, RWT 15-3836; MICHAEL LEONARD
FARLEY, RWT 15-3836; MICHAEL FARMER, RWT 15-3836; JASON D.
FARQUHARSON, RWT 15-3836; KENLEY FEAZELL, RWT 15-3836;
TIMOTHY DONALD FENDLEY, RWT 15-3836; EDWARD LEO FERGUSON,
RWT 15-3836; JOHN DAVID FIELDER, RWT 15-3836; MICHAEL RAY
FIELDS, RWT 15-3836; CRAIG D. FILLINGANE, RWT 15-3836; JAMES
AUSTIN FISHER, RWT 15-3836; REGINALD FLEMING, JR., RWT 15-3836;
DALE FORD, RWT 15-3836; RONALD LEE FRISBY, RWT 15-3836; BRAD L.
FRUHLING, RWT 15-3836; JOHN R. FUDALA, RWT 15-3836; TOMMY L.
FULLEN, RWT 15-3836; CARRIE C. GALLAGHER, RWT 15-3836; TOM LEE
GALLAGHER, RWT 15-3836; ERIC BRADLEY GANN, RWT 15-3836;
KAREN M. GHARST, RWT 15-3836, Formerly Gabriele; KARL MALINSKI
GIBBS, RWT 15-3836; MICHAEL P. GIBSON, RWT 15-3836; MITCHELL P.
GILL, RWT 15-3836; AUDREY DEMON GLENN, RWT 15-3836; SANDI
CHRISTINE GOLDEN-VEST, RWT 15-3836; RIGO A. GONZALEZ, RWT 15-
3836; LEONARD GOODSON, III, RWT 15-3836; MICHAEL A. GRILEY, JR.,
RWT 15-3836; MICHAEL A. GROCHOWSKI, RWT 15-3836; MICHAEL W.
HAFKE, RWT 15-3836; JARROD C. HALL, RWT 15-3836; JAMAR HAM,
RWT 15-3836; BRYAN HAMILTON, RWT 15-3836; RICHARD P.

HAMILTON, RWT 15-3836; JIMMY LYNN HAMPTON, RWT 15-3836; DAVID F. HAPPLE, RWT 15-3836; RICHARD ALAN HARDISON, RWT 15-3836; MIKEL HARPER, RWT 15-3836; JASON PAUL HATFIELD, RWT 15-3836; LARRY HAYNES, RWT 15-3836; WILLIAM JAMES HEARD, RWT 15-3836; JOHN L. HENDERSON, RWT 15-3836; WILLIAM MYRON HENDERSON, RWT 15-3836; CHRISTOPHER S. HENRIKSON, RWT 15-3836; ALLISON MARIKO HILL, RWT 15-3836; MARK A. HILL, RWT 15-3836; RICHARD CARL HOGAN, JR., RWT 15-3836; CLYDE RICHARD HOLDER, RWT 15-3836; STEVEN WAYNE HOLLEY, RWT 15-3836; MARCO ALEXANDER HORSEWOOD, RWT 15-3836; JAMES HERSHEL HUDSON, III, RWT 15-3836; AUNDREA M. HUNT, RWT 15-3836; MATTHEW CALVIN HURT, JR., RWT 15-3836; OZANE JACKSON, RWT 15-3836; WANDA N. JACKSON, RWT 15-3836; WADE JACOBSON, RWT 15-3836; ERIC JAEGER, RWT 15-3836; LAWRENCE J. JANKOWSKI, RWT 15-3836; DANIEL MARTIN JASONI, RWT 15-3836; RALPH BENJAMEN JENKINS, RWT 15-3836; ANTERIAN D. JOHNSON, RWT 15-3836; MICHELLE A. JOHNSON, RWT 15-3836; BRANDON CHRISTOPHER JOHNSTON, RWT 15-3836; DAVID ALLEN JONES, II, RWT 15-3836; JULIAN K. JONES, RWT 15-3836; PAUL G. JONES, RWT 15-3836; THOMAS K. JONES, RWT 15-3836; PAUL ANTHONY JONES, RWT 15-3836; SAMI JUMA, RWT 15-3836; STANLEY K. KAINA, JR., RWT 15-3836; KELLY JEAN KARL-FORST, RWT 15-3836; DANIEL R. KEARNEY, RWT 15-3836; BRYAN KEITH KEESE, RWT 15-3836; EDWIN KEITH, SR., RWT 15-3836, (PR); STEPHEN RANDALL KEITH, RWT 15-3836; JAMES ERIC KELLEY, RWT 15-3836; GEORGE KEYS, JR., RWT 15-3836; MICHAEL J. KIDDER, RWT 15-3836; DOULGAS HAMILTON KINARD, JR., RWT 15-3836; JAMES E. KIRK, RWT 15-3836; DAVID W. KIRKLAND, RWT 15-3836; GERALD KENNETH KREIN, RWT 15-3836; ROBIN KRUSKOL, RWT 15-3836; MICHAEL D. KUSEK, RWT 15-3836; SEAN M. LADD, RWT 15-3836; PHILIP LAM, RWT 15-3836; CLIBURN LANE, JR., RWT 15-3836; PIERRE O'DELL LARKIN, RWT 15-3836; BRUCE G. LAUREIRO, RWT 15-3836; THADDEUS R. LAWRENCE, SR., RWT 15-3836; MICHAEL A. LEBLANC, RWT 15-3836; CHRISTINA L. LEE, RWT 15-3836; MICHAEL CHARLES LEE, RWT 15-3836; ROBERT LIPPOLIS, RWT 15-3836; BRIAN KEITH LLOYD, RWT 15-3836; DEMPSEY LOVETT LOGUE, SR., RWT 15-3836; FRANKLIN GERALD LOWE, RWT 15-3836; FRANKLIN GERALD LOWE, RWT 15-3836; MICHAEL LEE LOWE, RWT 15-3836; CHARLES J. LOWERY, RWT 15-3836; JUAN LUGO, RWT 15-3836; MICHAEL L. MADIGAN, RWT 15-3836; DANIEL MAESTAS, RWT 15-3836; WILLIAM MAGEE, RWT 15-3836; JASON B. MARTIN, RWT 15-3836; DONALD EDMUNDO MARTINEZ, RWT 15-3836; OMOWUNMI MARTINS, RWT 15-3836; JON HARDING MASON, RWT 15-3836; RHONDA SUE MATCHETT, RWT 15-3836; MICHAEL LEE MAYNARD, RWT 15-3836; ALAN AUSTIN MAYS, RWT 15-3836;

FREDERICK D. MCCOLLUM, RWT 15-3836; JOHN ALBERT MCDONALD, RWT 15-3836; CORY ORLANDO MCGILL, RWT 15-3836; RAHMAN A. MCKINNON, RWT 15-3836; MURRILL L. MCLEAN, RWT 15-3836; ERIC B. MCLENDON, RWT 15-3836; SHAWN K. MCLEOD, RWT 15-3836; DENNIS E. MCMULLEN, RWT 15-3836; JONATHAN MEDINA, RWT 15-3836; RODNEY W. MEECE, RWT 15-3836; NATHAN T. MEIDL, RWT 15-3836; ALEXANDER MENKES, RWT 15-3836; KEITH R. MENZER, RWT 15-3836; JEFFREY A. MEO, RWT 15-3836; MARY A. MICKENS, RWT 15-3836, (Currently Glass, Mary A.); JAMES CUTHBERT MIDGETT, RWT 15-3836; AMANDA G. MILLER, RWT 15-3836; JAMES EDWARD MILLER, RWT 15-3836; LORI LYNN MITCHELL, RWT 15-3836; WILLIE J. MITCHELL, RWT 15-3836; PATRICK C. MONDRAGON, RWT 15-3836; DAVID A. MONTGOMERY, RWT 15-3836; BRIAN DAVID MURPHY, RWT 15-3836; TIMOTHY M. MURRAY, RWT 15-3836; FAYIZ NALU, RWT 15-3836; CHRISTOPHER LYNN NANNEY, RWT 15-3836; ANDREA MICHELE NEUTZLING, RWT 15-3836; RICHARD J. NICHOLLS, RWT 15-3836; SAMUEL NIEVES, RWT 15-3836; HANNA P. NISSAN, RWT 15-3836; MICHAEL A. NORTHUP, RWT 15-3836; LAURA J. NOWLIN, RWT 15-3836; CHRISTOPHER SEAN NYBERG, RWT 15-3836; PATRICK MICHAEL O'CONNELL, RWT 15-3836; BRENDA M. O'NEAL, RWT 15-3836; ANTHONY BRETT OGDEN, RWT 15-3836; THOMAS K. OLESON, RWT 15-3836; THETA A. OLSON, RWT 15-3836; CARL ORLANDO, RWT 15-3836; CHRISTINE OSORIO, RWT 15-3836; LEWIS PALMER, RWT 15-3836; TIMOTHY STEVEN PARKE, RWT 15-3836; GREGORY D. PARKER, RWT 15-3836; ROBERT WILLIAM PAXTON, RWT 15-3836; MICHELE A. PEARCE, RWT 15-3836; AUDREY S. PERRY, RWT 15-3836; JOSHUA NATHAN PERUSSE, RWT 15-3836; DEBORA J. PFAFF, RWT 15-3836; JODY LEE PIERCY, RWT 15-3836; GREGORY J. PIETZ, RWT 15-3836; JAMES POLLOCK, RWT 15-3836; TAI PORTER, RWT 15-3836; JAMES PRESTON POTTER, JR., RWT 15-3836; LAUREN CAROL PRICE, RWT 15-3836; CEDRIC EUGENE PRICE, SR., RWT 15-3836; CALVIN PRIEST, RWT 15-3836; TANYA QUINCY, RWT 15-3836; VARITA V. QUINCY, RWT 15-3836; ROBERT F. RAMOS, JR., RWT 15-3836; GEORGE RICHARD RAPCIEWICZ, JR., RWT 15-3836; RYAN C. RASMUSSEN, RWT 15-3836; CHAD ROBERT READ, RWT 15-3836; TOMMY R. REDDICK, RWT 15-3836; BRUCE L. REGES, RWT 15-3836; DANIEL R. REYES, RWT 15-3836; MILTON M. REYNOLDS, RWT 15-3836; RICHARD D. RICE, RWT 15-3836; DANIEL EDWARD RICE, JR., RWT 15-3836; STEVEN S. RICHARDSON, RWT 15-3836; PAUL A. RICHMOND, RWT 15-3836; CHARLES RAYMOND RIIPPI, RWT 15-3836; LEONARD RITUMS, RWT 15-3836; VICTOR M. RIVERA, RWT 15-3836; WILLIAM O. ROARK, III, RWT 15-3836; JAMES ROBIN, RWT 15-3836; DANIEL M. ROBSHAW, RWT 15-3836; WAYNE RODRIGUEZ, RWT 15-3836; JOSE C. ROQUE, RWT 15-3836; ERNEST

RICHARD ROTH, RWT 15-3836; CARTER CHARLES RUFF, RWT 15-3836; TERRY SALAZAR, RWT 15-3836; JAMES ROBERT SANDEFUR, RWT 15-3836; JOHNNIE C. SANDERS, JR., RWT 15-3836; CARLOS J. MARTIR SANDOVAL, RWT 15-3836; JEREMEN SANDOVAL, RWT 15-3836; HOBART P. SAUNDERS, RWT 15-3836; DANIEL B. SCHULTZ, RWT 15-3836; ROLAND DAVID SCHULZ, RWT 15-3836; ROLAND PERRY SHARP, RWT 15-3836; CHRISTOPHER R. SIMMONS, RWT 15-3836; MAREK M. SIPKO, RWT 15-3836; GREGORY C. SKYLES, RWT 15-3836; HOWARD LEON SLADE, RWT 15-3836; DAMIAN L. SMITH, RWT 15-3836; DAVID JOHN SMITH, RWT 15-3836; JASON WILLIAM SMITH, RWT 15-3836; KRYSTE SWANZETTA SMITH, RWT 15-3836; RONALD LAYNE SMITH, RWT 15-3836; TRACY LEMAR SMITH, RWT 15-3836; AZARIAH SMITH, JR., RWT 15-3836; FRANKLIN O. SNOW, RWT 15-3836; MICHAEL L. SONGY, RWT 15-3836; KRISTIN SOUTHWELL, RWT 15-3836, formerly Otterstetter; SUZANNE M. SPEIGHT, RWT 15-3836; DAVID P. STAFFA, RWT 15-3836; NAPOLEAN L. STAFFORD, RWT 15-3836; MICHAEL CHRISTOPHER STANCO, RWT 15-3836; EDWIN STEELE, RWT 15-3836; BRYAN L. STEVENS, RWT 15-3836; ANTHONY K. STEWARD, RWT 15-3836; SCOTT H. STRADLEY, RWT 15-3836; SHAWN E. STROUT, RWT 15-3836; CARL THOMAS SULLIVAN, RWT 15-3836; NEAL MARK SUTHERLAND, RWT 15-3836; DAVID M. SWAN, RWT 15-3836; DAVID B. SWANEY, RWT 15-3836; AUBREY DANYELLE TAPLEY, RWT 15-3836; MILAN B. THAKKAR, RWT 15-3836; TROY THOMAS, RWT 15-3836; CHRISTOPHER T. THORNHILL, RWT 15-3836; TYRONE ANTHONY TIMMS, RWT 15-3836; ANTHONY TRINIDAD, RWT 15-3836; MICHAEL ADAM TUMLINSON, RWT 15-3836; RICKY L. TURNER, RWT 15-3836; NATHAN P. TURNOCK, RWT 15-3836; EDWIN TODD TURPIN, RWT 15-3836; ERIK D. UPHAM, RWT 15-3836; STEPHENY GUPTON, RWT 15-3836, (PR); PAUL R. VADNEY, RWT 15-3836; DANIEL E. VALENTINE, RWT 15-3836; SIMON ALLEN WADE, RWT 15-3836; ROBERT WAGENAAR, RWT 15-3836; RICKEY TREYMANE WAITERS, RWT 15-3836; ERVIN L. WALKER, RWT 15-3836; TEDDRIC O'NEAL WALKER, RWT 15-3836; ALBERTO JOSEPH WALRATH, RWT 15-3836; JULIO PIPINO WALTON, RWT 15-3836; GORDON ALLEN WARD, RWT 15-3836; ERIC G. WATERS, SR., RWT 15-3836; TIMOTHY J. WATSON, RWT 15-3836; GEORGE L. WATSON, III, RWT 15-3836; EDWARD B. WEIBL, RWT 15-3836; KOLE WELSH, RWT 15-3836; WILLIAM WESTLEY WESTBURG, JR., RWT 15-3836; DAVID B. WHALING, RWT 15-3836; JACOB WHETSTONE, RWT 15-3836; KATRINA LEANN WHITE, RWT 15-3836, Formerly Hightower; WILLIAM EMMETT WHITE, RWT 15-3836; ARTHUR WHITESIDE, RWT 15-3836; CLARENCE WILLIAM WICKHAM, RWT 15-3836; BELINDA M. WILLIAMS, RWT 15-3836; ROBERT L. WILLIAMS; TONY WILLIAMS, RWT 15-3836; ANTOINE LAVANTA WILLIAMS, SR., RWT 15-3836; JIMMY

8

DWAYNE WILLIAMS, RWT 15-3836; KORI L. WILLIS, RWT 15-3836; RENE L. WILSON, RWT 15-3836; RONNAL WOMACK, RWT 15-3836; KEVIN L. WOODRUM, RWT 15-3836; DONALD P. WORRELL, RWT 15-3836; TONY L. WRIGHT, SR., RWT 15-3836; CLIFFORD YARDBROUGH, RWT 15-3836; SHAMERAN YOUKHANA, RWT 15-3836; RAPHAEL A. ZAMORA, RWT 15-3836; STEVEN C. ZIMMERMAN, RWT 15-3836; MICHAEL E. ZUNDLE, RWT 15-3836; TERRY ENNIS ADKINS, RWT 15-4020; ISSAC AGUILAR, RWT 15-4020; FRANCISCO EMILIO ALEXANDER, JR., RWT 15-4020; MEGHAN ARTEMIS O'CONAN, RWT 15-4020; SEVIM AYBULUT, RWT 15-4020; LORIN GENE BANNERMAN, RWT 15-4020; GREGORY O. BARNES, RWT 15-4020; ADAM M. BARTON, RWT 15-4020; CLAUDE N. BENSON, RWT 15-4020; BARRY J. BIEGO, RWT 15-4020; EDWARD LEE BRANCH, RWT 15-4020; YUSVF KENYATTA BRANTLEY, SR., RWT 15-4020; ALBERT BRIDGEMAN, RWT 15-4020; CASSANDRA BRUSHWOOD, RWT 15-4020; DESHUNNON CANNADY, RWT 15-4020; CLAUDIA CASTILLO, RWT 15-4020; JAMES RAY CHANDLER, III, RWT 15-4020; RICHARD COREY, RWT 15-4020; STEVE CROWSTON, RWT 15-4020; DAVID B. DA SILVA, SR., RWT 15-4020; CHARLES RAY DANIELS, RWT 15-4020; RYAN DEWITT TAYLOR, RWT 15-4020; WILLIAM J. DEVITO, RWT 15-4020; ENRIQUE DIAZ, RWT 15-4020; FRANK DOMEAUX, RWT 15-4020; MICHAEL R. DRUMMOND, JR., RWT 15-4020; TERRY W. EDGERTON, RWT 15-4020; JEFF EDWARDS, RWT 15-4020; MAURO CESAR FAZ, RWT 15-4020; NATHANIEL L. FLOYD, JR., RWT 15-4020; KENNETH NEIL FRANCIS, RWT 15-4020; RANDY R. GARCIA, RWT 15-4020; DANIEL R. GETTRIDGE, III, RWT 15-4020; MARK THOMAS GILBERT, RWT 15-4020; TAEISHA L.. GLENN, RWT 15-4020; MICHAEL P. GREENBURG, RWT 15-4020; DARYL GRIFFIN, RWT 15-4020; JONATHAN T. HALL, RWT 15-4020; KENNETH HALL-MAY, RWT 15-4020; MARLIN BRETT HALSTEAD, RWT 15-4020; JASON HAMMAN, RWT 15-4020; ROBERT WAYNE HARDY, JR., RWT 15-4020; THOMAS WILLIAM HEPPLER, RWT 15-4020; AUSTIN L. HILL, RWT 15-4020; ARTHUR L. HILLARD, RWT 15-4020; JONATHAN M. HINCKLEY, RWT 15-4020; ROBERT HOLDING, RWT 15-4020; ZACHARY RYAN HOLMES, RWT 15-4020; MESHELL TEE HORTON, RWT 15-4020; BRADLEY W. HUDSON, RWT 15-4020; WILLIAM M. HUDSON, RWT 15-4020; TODD LEE HUNKINS, RWT 15-4020; KIMBERLY HUNTER-PREWITT, RWT 15-4020; TIMOTHY P. HURLEY, RWT 15-4020; ROBERT E. JACKSON, JR., RWT 15-4020; CODY CARLTON JENNINGS, RWT 15-4020; JUNUOR AUGUSTUS JOHN, RWT 15-4020; CHARONDA LEVONNE JOHNSON, RWT 15-4020; NATHANIEL JOYNER, III, RWT 15-4020; SCOTT T. KAMM, RWT 15-4020; DOUGLAS L. KELLY, RWT 15-4020; PAUL J. KITTLE, JR., RWT 15-4020; AARON WAYNE KLETZING, RWT 15-4020; MORROW S. KRUM, JR., RWT 15-4020; KENNETH D. KUYKENDALL, RWT 15-4020; ROGER A. LANKFORD, RWT 15-4020; JAMES NOLAN LAW,

JR., RWT 15-4020; HOWARD DEWITT LINSON, RWT 15-4020; MICHAEL D. LOPEZ, RWT 15-4020; TODD JASON MARLETT, RWT 15-4020; ELSA E. MARTINEZ, RWT 15-4020; GARY MASON, II, RWT 15-4020; JALMER A. MATEOLOPEZ, RWT 15-4020; DAN PATRICK MCDONOUGH, JR., RWT 15-4020; FREDRICK MCGEE, RWT 15-4020; JAMES R. MCPHERSON, RWT 15-4020; CLARENCE L. MCQUEEN, JR., RWT 15-4020; RYAN T. MCQUILLIAN, RWT 15-4020; EDWARD E. MELVIN, JR., RWT 15-4020; SCOTT DAVID MIRODDI, RWT 15-4020; FRANCIS D. MOLLARD, III, RWT 15-4020; ANTHONY MOORE, RWT 15-4020; BRIAN EDWARD MOORE, RWT 15-4020; RONNIE DEWAYNE NANTZ, RWT 15-4020; SEAN M. NELSON, RWT 15-4020; ERIC JEVON NICHOLS, RWT 15-4020; MARKUS LAMONT NORTHINGTON, RWT 15-4020; DAWN O'NEAL, RWT 15-4020; JOSE S. OCHOA, III, RWT 15-4020; JAN ERIK OHRSTROM, RWT 15-4020; LEROY ONTIBEROS, RWT 15-4020; LEROY WAYNE OSBORNE, RWT 15-4020; PHILLIP W. OSSOWSKI, RWT 15-4020; JONATHAN M. OWENS, RWT 15-4020; MATTHEW A. PADGETT, RWT 15-4020; CHARLES W. PAK, RWT 15-4020; BLU J. PANNHOFF, RWT 15-4020; WESLEY DEWAYNE PARKER, RWT 15-4020; VERNON PATTON, RWT 15-4020; MICHAEL A. PAYNE, RWT 15-4020; ZACHARY A. PAYNE, RWT 15-4020; SCOTT PENNINGTON, RWT 15-4020; MATTHEW E. PERETZ, RWT 15-4020; ALBERT GORDON PLUMLEE, JR., RWT 15-4020; CHARLOTTE RENEE PORCH, RWT 15-4020; AARON M. PRICE, RWT 15-4020; DANIEL RAULT, RWT 15-4020; VALIANT L. REA, RWT 15-4020; CHRISTOPHER R. REED, RWT 15-4020; MATTHEW RIDDLE, RWT 15-4020; DESHAUN A. RINGWOOD, RWT 15-4020; BRYCE W. RODGERS, RWT 15-4020; WILLIAM ROESSLING, RWT 15-4020; WILLIAM MICHAEL ROSE, JR., RWT 15-4020; JOE SANCHEZ, SR., RWT 15-4020; GABRIEL SCOTT, JR., RWT 15-4020; TIMOTHY E. SHEETS, RWT 15-4020; RALPH CALVIN SIEG, RWT 15-4020; KENNETH FRANCIS SLACH, RWT 15-4020; WILLIAM SMITH, RWT 15-4020; CRAIG S. SOTEBEER, RWT 15-4020; JONATHAN R. SPURKOSKY, RWT 15-4020; JAY D. STARR, RWT 15-4020; JOSH L. STEININGER, RWT 15-4020; TREVOR B. TAYLOR, RWT 15-4020; JEREMY E. TELLEZ, RWT 15-4020; DAVID J. TEXADA, RWT 15-4020; RODNEY J. THURMAN, RWT 15-4020; BRIAN P. TOLBERT, RWT 15-4020; LEROY TORRES, RWT 15-4020; DAVID TRAN, RWT 15-4020; JOSE J. TREJO, RWT 15-4020; ROSARIO TROTSKY, RWT 15-4020; JASON S. VEST, RWT 15-4020; RENEE E. VILLEGAS, RWT 15-4020; ROBERT L. WILLIAMS, JR., RWT 15-4020; RODERICK W. WALKER, RWT 15-4020; THOMAS J. WASHINGTON, JR., RWT 15-4020; MARK H. WELLS, RWT 15-4020; CARL DEAN WILEY, RWT 15-4020; DR. CAROLINE WILLIAMS, RWT 15-4020; JAMES R. YORK, RWT 15-4020; STEVEN J. ZALETEL, SR., RWT 15-4020; ROBERT D. ZIEGELMAIR, RWT 15-4020; LAURA JONES; KEITH JONES; JAMES W. SAVINO, III; JULIA SAVINO; TERRANCE SORDAHL; JONATHAN COOK, RWT 16-2880;

DAVID MONTOYA, RWT 15-2404; JEFF BALDUINI, RWT 15-3531; MICHAEL HARTMAN, RWT 15-3531; BRETT NUTTER, RWT 15-3531; WILLIAM VANCE, RWT 15-3531,

            Plaintiffs – Appellants,

    v.

KBR, INC.; KELLOGG BROWN & ROOT, LLC; HALLIBURTON COMPANY; KELLOGG BROWN & ROOT SERVICES, INC.; BROWN AND ROOT SERVICES; DII INDUSTRIES, LLC; HALLIBURTON ENERGY SERVICES, INC.; KBR HOLDINGS, LLC; KELLOGG BROWN & ROOT, INC.; KELLOGG BROWN & ROOT INTERNATIONAL, INC.; KBR GROUP HOLDINGS, LLC; KBR TECHNICAL SERVICES, INC.,

            Defendants – Appellees,

    and

ERKA LTD.,

            Defendant.

-------------------------

PROFESSIONAL SERVICES COUNCIL; NATIONAL DEFENSE INDUSTRIAL ASSOCIATION,

            Amici Supporting Appellees.

---

Appeal from the United States District Court for the District of Maryland, at Greenbelt. Roger W. Titus, Senior District Judge.  (8:09-md-2083-RWT)

---

Argued:  May 9, 2018                         Decided:  June 20, 2018

---

Before KING, DIAZ, and FLOYD, Circuit Judges.

---

Affirmed in part and vacated in part by published opinion.  Judge Floyd wrote the opinion, in which Judge King and Judge Diaz joined.

———————

**ARGUED:**  Susan L. Burke, LAW OFFICES OF SUSAN L. BURKE, Baltimore, Maryland, for Appellants.  Warren W. Harris, BRACEWELL LLP, for Appellees.  **ON BRIEF:**  Frederick C. Baker, Lisa Marie Saltzburg, James W. Ledlie, MOTLEY RICE, LLC, Mt. Pleasant, South Carolina, for Appellants.  Raymond B. Biagini, Robert A. Matthews, Daniel L. Russell Jr., Marianne F. Kies, COVINGTON & BURLING LLP, Washington, D.C.; Jeffrey L. Oldham, Yvonne Y. Ho, BRACEWELL LLP, Houston, Texas, for Appellees.  Lisa Norrett Himes, ROGERS JOSEPH O'DONNELL, PC, Washington, D.C.; Lawrence S. Ebner, CAPITAL APPELLATE ADVOCACY PLLC, Washington, D.C.; Alan L. Chvotkin, PROFESSIONAL SERVICES COUNCIL, Arlington, Virginia, for Amici Curiae.

———————

FLOYD, Circuit Judge:

The Constitution entrusts the President and Congress, not the courts, with the power to resolve political questions. *See Japan Whaling Ass'n v. Am. Cetacean Soc'y*, 478 U.S. 221, 230 (1986); *Taylor v. Kellogg, Brown & Root Servs., Inc.*, 658 F.3d 402, 408–409 (4th Cir. 2011). The issue before us is whether a suit brought by United States military personnel, civilian contractors, and surviving family members (collectively "Servicemembers") against Kellogg, Brown, & Root, LLC, and Halliburton Company (collectively "KBR") for injuries allegedly caused by KBR's waste management and water services across Iraq and Afghanistan implicates such a political question.

This case returns to us after the district court created an extensive factual record through a herculean discovery process and once again concluded that the Servicemembers' suit implicates a political question that federal courts cannot adjudicate. *See In re KBR, Inc., Burn Pit Litig.*, 268 F. Supp. 3d 778 (D. Md. 2017) ("*Burn Pit IV*"). Additionally, the district court held that the Federal Tort Claims Act ("FTCA") preempts the Servicemembers' claims. We agree with the district court that the political question doctrine bars the Servicemembers' suit. Therefore, we need not reach the FTCA preemption issue. Accordingly, we affirm in part and vacate in part.

I.

A.

Since the United States began its military operations in Afghanistan and Iraq in 2001 and 2003, respectively, the U.S. military has depended heavily on contractors to

support its mission.  For example, as the military established forward operating bases ("FOBs") across the two theaters, those bases necessitated extensive contractor support for the management of waste, ammunition, fuel, and facilities, and provision of water treatment and food services, so that the warfighters could focus on combat operations. To provide waste management and water services at the FOBs, the Army awarded KBR a ten-year contract called the Logistics Civil Augmentation Program III ("LOGCAP III").

Since 2008, through 63 separate complaints, the Servicemembers have sued KBR, alleging that they suffered harms from being exposed to smoke from open air burn pits and drinking impure water.[1]  The Judicial Panel on Multidistrict Litigation consolidated and transferred these cases to the District of Maryland for pretrial proceedings.  The amended complaint, in large part, alleges that KBR failed to design, manage, and operate the burn pits safely and to treat and monitor water qualities.

Before any jurisdictional discovery took place, on February 27, 2013, the district court granted KBR's renewed motion to dismiss.[2]  *In re KBR, Inc., Burn Pit Litig.*, 925 F. Supp. 2d 752, 774 (D. Md. 2013) ("*Burn Pit II*").  The district court concluded that (1) the case presented a nonjusticiable political question, (2) KBR was shielded from suit under derivative sovereign immunity, and (3) the FTCA preempted the Servicemembers' state law claims.  *See id.* at 765–68, 771.  On appeal, this Court vacated and remanded on

---

[1] Many of these cases are purported class actions on behalf of hundreds of thousands of military personnel and civilian contractors.

[2] The district court had denied KBR's initial motion to dismiss.  *In re KBR, Inc., Burn Pit Litig.*, 736 F. Supp. 2d 954 (D. Md. 2010) ("*Burn Pit I*").

14

the grounds that the record was not sufficiently developed to support the district court's decision. *In re KBR., Burn Pit Litig.*, 744 F.3d 326 (4th Cir. 2014) ("*Burn Pit III*").

On remand, the district court commenced jurisdictional discovery regarding "(1) [t]he degree to which the military controlled KBR's performance of the contracts" and "(2) [t]he degree to which KBR was integrated into military command."[3]   J.A. 332. Jurisdictional discovery yielded over 5.8 million pages of documents, including almost a million pages of contract documents, and 34 witness depositions.  After the conclusion of jurisdictional discovery, KBR moved to dismiss for lack of subject matter jurisdiction pursuant to Rule 12(b)(1) based on the political question doctrine and for summary judgment pursuant to Rule 56 based on FTCA preemption.  The district court held an evidentiary hearing during which each side presented a comprehensive case.  KBR presented six live witnesses.  The Servicemembers presented one live witness and introduced deposition testimony excerpts and the contractual language from LOGCAP III and various task orders.

### B.

Based on the evidence gathered from jurisdictional discovery and presented during the evidentiary hearing, the district court made key factual findings pertaining to (1)

---

[3] On remand, the district court expressly excluded the question of derivative sovereign immunity from discovery, and later similarly declined to rule on this issue.  *See* J.A. 332; *Burn Pit IV*, 268 F. Supp. 3d at 786 n.5.

KBR's management of waste, (2) KBR's provision of water services, (3) the military's contracting process, and (4) KBR's integration into the military chain of command.

1.

The district court found that "the military, after balancing all the risks and alternative methods of waste disposal, made the sensitive decision to use burn pits, and only burn pits, at all FOBs in Iraq and Afghanistan." *Burn Pit IV*, 268 F. Supp. 3d at 803. The district court also found that the military determined that no feasible alternatives to burn pits—such as the use of incinerators, landfills, or recycling—were available, and KBR could not unilaterally decide to use burn pits. *Id.* at 806–07.

In making these findings, the district court relied on the testimony of Lieutenant General, retired, Ricardo Sanchez, the commanding general of the U.S. forces in Iraq in the immediate aftermath of the invasion of Iraq, who testified that the military's theater command "mandated that burn pits be used for eliminating all of the trash" across the entire theater. *Id.* at 791 (quoting J.A. 4852). The court also cited the testimony of Lieutenant General, retired, John Vines, who assumed command after General Sanchez, that his predecessor's "standing orders remain[ed] in effect," that he did not need to affirmatively re-authorize the use of the burn pits, and that he did not consider alternatives to burn pits to be feasible. *Id.* at 792 (quoting J.A. 4917).

The district court explained that the theater command's decision to use burn pits "reflected a military judgment . . . in the dangerous, wartime contingency environment." *See id.* at 807. The district court relied on General Vines's testimony that alternatives

16

such as landfills or recycling services were not feasible because "the slightest movement [of the U.S. forces] expose[d] those moving to hostile actions." *Id.* at 806 (quoting J.A. 4918). The record also contains a written declaration of General Sanchez who similarly opined that landfills inside the FOBs would have posed a risk of the spread of disease, stench, and vermin, and landfills outside the FOBs would have posed "an unacceptable level of security risk" to personnel disposing of waste. J.A. 914.

The district court further found that the military decided against using incinerators and that KBR could not unilaterally decide to install incinerators to dispose of waste. The court relied on various witness testimonies, establishing that the military had to approve the acquisition, funding, and transportation of incinerators into the Iraqi theater. The district court also cited to General Vines's testimony that "everything that came in[to] [Iraq] required support sustainment" and "had side effects." *Burn Pit IV*, 268 F. Supp. 3d at 807 (quoting J.A. 4918). Bringing the incinerators into Iraq would have required the military to provide a military convoy, potentially diverting combat personnel. Based on this testimony, the district court found that the military—not KBR—decided to forgo the use of incinerators. In addition to the district court's findings, the record contains General Sanchez's written declaration that the acquisition and transportation of the incinerators did not amount to a military priority because, given the "limited transportation capacity," the military focused on transporting "mission-critical supplies, i.e., ammunition and fuel." J.A. 916.

The district court further found that the military "made all decisions regarding the location of burn pits on the FOBs in Iraq and Afghanistan." *Burn Pit IV*, 268 F. Supp. 3d

17

at 804.  The district court cited to various witnesses' testimonies stating that every FOB had a base commander who "exert[ed] total operational and physical control" over the base, that these base commanders "decided where everything went," including the burn pits, and that KBR could not "unilaterally move a burn pit from one location to another." *Id.* at 805 (quoting J.A. 1076, 1362, 4955).  The record also contains General Vines's testimony, explaining that the location for a burn pit implicated a military decision that only the military commanders could make, because the burn pit "could affect the road network, communications plan, building [of] a quick reaction force, [the ability to] maneuver[] around the base in event of infiltration, [the] potential for introduction of disease, [t]he effect of wind direction, the effect of smoke, [and the] operation on an air field."  J.A. 4923.

In addition to the siting decisions, the district court found that "[t]he military exercised control over the operation of the burn pits," and that "KBR was at all times acting under the comprehensive direction and control of the military."  *Burn Pit IV*, 268 F. Supp. 3d at 805–06.  One example of the military's exercise of control, the court noted, was the military's determination as to which items could be burned and which items could not.  Based on the two commanding generals' testimonies, various memoranda, and letters of technical direction ("LOTD"),[4] the court observed that the military directed the following items to be burned:  plastic water bottles, animal

---

[4] Under the relevant acquisitions practices, LOTDs are contractual documents that "order[] [contractors] to initiate performance of the requirements set forth in the task order[s]."  J.A. 1074.

18

carcasses, dining facility trash, woven fiber filters, and oil filters. *Id.* at 805. Additionally, the district court cited the declaration of Gerald E. Vincent, a Department of the Army civilian employee who served as the Environmental Program Manager in Iraq, stating that "[i]f something was not specifically prohibited, then it was allowed to be burned." *Id.* at 806 (quoting J.A. 1797). Relatedly, as the district court noted, the military determined that hazardous materials were "to be segregated and disposed of by a method other than surface burning" and "not authorized to be placed in burn pits." *Id.* (quoting J.A. 4933).

Other portions of the record, cited by the district court, similarly demonstrate the military's plenary control over the operation of the burn pits. For example, one LOTD, dated January 1, 2006, directs KBR "to reduce the amount of solid waste being burned at Camp Echo at one time by conducting multiple burns of smaller quantities of trash." J.A. 2039. With regard to the hours of operation, the district court cited to one LOTD, dated November 11, 2006, that directed KBR to change the burn pit hours at FOB Summerall, Iraq, from 24 hours to 10 hours a day; and then to another LOTD, dated December 29, 2006, that directed KBR to operate the burn pit at Bagram Air Field, Afghanistan, for 24 hours. *Burn Pit IV*, 268 F. Supp. 3d at 805 (quoting J.A. 2050, 2052). Lastly, the standard operating procedure in place for the U.S. forces in Iraq provided that "[f]lames above the burning material must not be higher than (2) Feet." J.A. 4394.

2.

Next, the district court found that "the military retained a high level of control over KBR's provision of water services in Iraq and Afghanistan" and that the military's control was "not limited to the 'what' of providing water, but rather included highly detailed specifications concerning 'how' it was to be provided." *Burn Pit IV*, 268 F. Supp. 3d at 808. The record demonstrates that water services amounted to a critical element of "force health protection" because it concerned prevention of dehydration, disease, and other non-battle injuries which could seriously undermine the readiness of the U.S. forces. *See* J.A. 1596, 1613. Yet, General Sanchez testified that water services presented a unique challenge to the military in theater as it "could not tap into Iraqi sources of water." J.A. 4839. The only options were to rely on reverse osmosis water purification or bottled water. The record indicates that bottled water was disfavored because transporting water was not as critical as transporting ammunition and fuel. Thus, the military units and civilian contractors produced potable water through reverse osmosis purification, "filtering and treating a variety of raw water sources, e.g., rivers and wells." J.A. 1818.

The district court found that the military "retained ultimate control over KBR's performance of [water] services and tested the water to ensure that the detailed military standards and methods were being met." *Burn Pit IV*, 268 F. Supp. 3d at 809. In making this finding, the district court relied on the written declaration of Lieutenant Colonel Tara Hall, the former Chairperson of the Multi-National Corps–Iraq Water Quality Board, who stated that the "Army Preventive Medicine had oversight over water operations in Iraq

20

and supervised the production, testing, and distribution of potable and nonpotable water." *Id.* at 801 (quoting J.A. 1818). In that declaration, Hall further explained that "the Army routinely tested potable and nonpotable water to ensure the water was safe for human uses" and "routinely certified and inspected [reverse osmosis water purification units] to ensure safety and sanitation." J.A. 1818. Although the district court acknowledged that "KBR was, at times, responsible for testing and ensuring the quality of water that it delivered," the court nevertheless found that "the military retained ultimate control." *Burn Pit IV*, 268 F. Supp. 3d at 808. The district court relied on testimonial and record evidence indicating that "Preventive Medicine personnel in theater were required, and regularly conducted, surveillance of the potable water at base camps." *Id.* (quoting J.A. 2192).

After finding that the military retained control over water quality, the district court cited various documents to further find that the military directed KBR on how to produce water, detailing the quantity, frequency, and location of production. *Id.* at 808. The record contains various documents, such as Task Order 89 which listed the varied amounts of water to be produced and stored at eight FOBs, directed KBR to "distribute potable water daily (seven days per week) to units within 250 km from [the specified locations]," and authorizing the use of reverse osmosis purification. J.A. 4100. Additionally, the record includes various LOTDs directing KBR to, for example, provide 52,000 gallons of water, fill water tanks, test water to a new dining facility, and operate certain water wells for up to 8 hours a day.

21

3.

With regard to the military's contracting process, the district court found that "[t]he operational arm of the military dictated all requirements" and that the military's contracting arm "implemented these decisions through the contracting process." *Burn Pit IV*, 268 F. Supp. 3d at 807.  Under the relevant federal acquisitions practices, only contracting professionals—such as contracting officers or administrative contracting officers—can alter the terms of a government contract or issue contract guidance through written documents such as LOTDs or administrative change letters.  The military's uniformed contracting professionals do not fall under the operational chain of command; instead, they often fall under a separate chain of command under the Defense Contract Management Agency ("DCMA").  DCMA receives delegated contract administration authority from a contracting agency, such as the Army Materials Command, and ensures that "both the contractor and the Government comply with the terms and conditions of the contract."  J.A. 1066.  In war zones, although there existed a formal divide between the operational arm and the contracting arm of the military, the contracting arm did not have the authority to change the requirements identified by the operational command.  In other words, the contracting arm merely translated the operational command's requirements into contractual terms and conditions.

Relatedly, during KBR's performance of the contract, the military had several methods of evaluating and controlling KBR.  DCMA conducted real-time inspections and quality assurance audits.  If KBR failed to meet the commander's intent, the military and KBR could informally address the deficiencies.  The military also possessed formal

22

methods including the issuance of formal directives to take corrective actions. Because LOGCAP III was a performance-based contract, KBR received its fee upon the government's evaluation of its work. Accordingly, the military evaluated KBR's performance through semi-annual award fee evaluation boards consisting of both contracting and operational military personnel.

4.

Lastly, the district court found that "KBR was integrated into the military's chain of command and its waste and water services were essential to the military's mission." *Burn Pit IV*, 268 F. Supp. 3d at 809. The district court first acknowledged that "the military commanders retained no direct command authority over KBR employees." *Id.* Although the military commanders could not issue direct orders to KBR, the district court relied on various witness and deposition testimonies to find that the military "retained authority and control over KBR's provision of waste and water services, and KBR was integrated into the military mission and chain of command." *Id.*

In making these findings, the court first cited to General Sanchez's testimony that "there were directives that were issued that required KBR to comply," and that KBR "could not make decisions unilaterally . . . without coordinating and integrating with the military." *Id.* (quoting J.A. 4880); *see also* J.A. 812 (Dep't of the Army Pamphlet 715–16, *Contractor Deployment Guide*, stating that "[c]ontractor employees will be expected to adhere to all guidance and obey all instructions and general orders issued by the Theater Commander or his/her representative."). The district court further relied on the

23

deposition testimony of Sari Berman, a former KBR employee, stating that KBR was "functionally under [military] command." *Burn Pit IV*, 268 F. Supp. 3d at 809 (alteration in original) (citing J.A. 1343). Berman's testimony further revealed that KBR participated in the military's weekly primary staff briefings, daily battle update briefings, monthly maintenance meetings, and command briefs. The record contains General Sanchez's written declaration, explaining that "KBR's integration into the command and control structures allowed the military to exercise the necessary levels of control over the entire logistics chain supporting its operations." J.A. 908.

* * *

Based on the extensive facts that it found regarding KBR's provision of waste management and water services, the military's contracting process, and KBR's integration into the military chain of command, the district court reached two holdings. First, the district court held that the Servicemembers' suit presented a political question and granted KBR's motion to dismiss for lack of subject matter jurisdiction. Second, the district court held that the FTCA preempted the Servicemembers' state law claims and granted summary judgment in KBR's favor.

## II.

"We review the district court's factual findings with respect to jurisdiction for clear error and the legal conclusion that flows therefrom de novo." *Scott v. Cricket Commc'n*, 865 F.3d 189, 194 (4th Cir. 2017) (internal quotation marks omitted). "The clearly erroneous standard is a demanding one. We may not simply overturn a lower

24

court's determination because we would reach a different conclusion." *In re Bate Land & Timber LLC*, 877 F.3d 188, 198 (4th Cir. 2017). "[A] finding is clearly erroneous when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *Anderson v. City of Bessemer City, N.C.*, 470 U.S. 564, 573 (1985) (internal quotation marks omitted). "If the district court's account of the evidence is plausible in light of the record viewed in its entirety, the court of appeals may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently." *United States v. Wooden*, 887 F.3d 591, 602 (4th Cir. 2018) (internal quotation marks omitted). In addition, "[w]e review a district court's grant of summary judgment de novo." *Variety Stores, Inc. v. Wal-Mart Stores, Inc.*, 888 F.3d 651, 659 (4th Cir. 2018) (internal quotation marks omitted).

III.

A.

Under Article III of the Constitution, "[t]he judicial power of the United States" extends to all cases arising under the Constitution and the laws of the United States. U.S. Const. art. III. The vesting of the judicial power in federal courts creates their emphatic duty "to say what the law is." *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 170, 177 (1803). Thus, federal courts have "a responsibility to decide cases properly before [them], even those [they] 'would gladly avoid.' " *Zivotofsky ex rel. Zivotofsky v. Clinton*,

566 U.S. 189, 194–95 (2012) (quoting *Cohens v. Virginia*, 19 U.S. (6 Wheat.) 264, 404 (1821)).

Even so, the Supreme Court has long recognized "a narrow exception" to the federal courts' duty and responsibility to decide cases, known as the political question doctrine. *Id.* at 195. A case or controversy "involves a political question-where there is 'a textually demonstrable constitutional commitment of the issue to a coordinate political department; or a lack of judicially discoverable and manageable standards for resolving it.' " *Nixon v. United States*, 506 U.S. 224, 228 (1993) (quoting *Baker v. Carr*, 369 U.S. 186, 217 (1962)). Federal courts will not examine cases involving a political question because doing so would encroach on the constitutional prerogatives of Congress and the President and because they are ill-equipped to decide these cases. *See Baker*, 369 U.S. at 217. In other words, the Constitution commits political questions to be resolved within "the halls of Congress or the confines of the Executive Branch," not on the steps of a federal courthouse. *Japan Whaling*, 478 U.S. at 230; *see also Marbury* 5 U.S. at 170 ("Questions, in their nature political, or which are, by the constitution and laws, submitted to the executive, can never be made in this court.").

"[M]ost military decisions are matters solely within the purview of the executive branch." *Al Shimari v. CACI Premier Tech., Inc.*, 758 F.3d 516, 533 (4th Cir. 2014) ("*Al Shimari III*") (internal quotation marks omitted). Whereas the Constitution confers authority over military affairs in Congress and designates the President as Commander in Chief, U.S. Const. art. I, §8; art. II, §2, "[i]t contemplates no comparable role for the judiciary," and "judicial review of military decisions would stray from the traditional

26

subjects of judicial competence," *Lebron v. Rumsfeld*, 670 F.3d 540, 548 (4th Cir. 2012). Given the unprecedented levels at which today's military relies on contractors to support its mission, however, this Court has recognized that a military contractor acting under military orders can also invoke the political question doctrine as a shield under certain circumstances. *See Taylor*, 658 F.3d at 411. Accordingly, when we are asked to review a military contractor's actions, we inquire whether such a review would lead to scrutinizing military decisions for which we lack the constitutional warrant and judicial competence. Under this Court's decision in *Taylor*, a suit against a military contractor raises a nonjusticiable political question if either (1) the military exercised direct control over the contractor, or (2) "national defense interests were closely intertwined with the military's decisions regarding [the contractor's] conduct." *Id.* A case must be dismissed as nonjusticiable if either of these factors is met. *Burn Pit III*, 744 F.3d at 335.

## B.

### 1.

Under the first *Taylor* factor, a suit against a military contractor presents a political question if the military exercised direct control over the contractor. *Al Shimari v. CACI Premier Tech., Inc.*, 840 F.3d 147, 156 (4th Cir. 2016) ("*Al Shimari IV*"). To qualify as direct control, the military's control over the government contractor must be plenary, *Burn Pit III*, 744 F.3d at 338 (quoting *Carmichael v. Kellogg, Brown & Root Servs., Inc.*, 572 F.3d 1271, 1276 (11th Cir. 2009)), and actual, *Al Shimari IV*, 840 F.3d at 156.

To determine whether the military's control is plenary, "a court must inquire whether the military clearly chose *how* to carry out [the contractor's activities], rather than giving the contractor discretion to determine the manner in which the contractual duties would be performed." *Al Shimari III*, 758 F.3d at 534 (internal quotation marks omitted). The military's control over the government contractor must rise "to the level of the military's control over the convoy in *Carmichael*." *Burn Pit III*, 744 F.3d at 338. In *Carmichael*, 572 F.3d at 1275, a military convoy—including fuel trucks being driven by KBR employees—was on a fuel resupply mission. During the mission, one of the trucks rolled over, threw Sergeant Carmichael out of the truck, and pinned him down, leaving him in a permanent vegetative state. *Id.* at 1278. In dismissing the suit, the Eleventh Circuit held that the military's control was plenary, because "the military decided the particular date and time for the convoy's departure; the speed at which the convoy was to travel; the decision to travel along a particular route . . . ; how much fuel was to be transported; the number of trucks necessary for the task; the speed at which the vehicles would travel; the distance to be maintained between vehicles; and the security measures that were to be taken." *Id.* at 1281; *see also Burn Pit III*, 744 F.3d at 338.

But the military's control is not plenary if the military "merely provides the contractor with general guidelines that can be satisfied at the contractor's discretion . . . ." *Burn Pit III*, 744 F.3d at 338 (quoting *Harris v. Kellogg, Brown & Root Servs., Inc.*, 724 F.3d 458, 467 (3d Cir. 2013)). For example, in *Taylor*, 658 F.3d at 404, a Marine who was working on a broken power generator at a tank maintenance ramp suffered severe injuries when a KBR technician turned on the generator without confirming that the work

was complete. This Court concluded that the military's control over the contractor was not plenary, because the military had contractually assigned all responsibility for safety and supervision to KBR, and "KBR was nearly insulated from direct military control . . . ." *Id.* at 411. Similarly, in *Harris*, 724 F.3d at 463, a soldier was electrified to death in the shower because of a water pump that was, allegedly, negligently installed and maintained. The Third Circuit concluded that the military's control over KBR was not plenary because of KBR's "significant discretion over how to complete authorized work orders," "the lack of detailed instructions in the work orders," and "the lack of military involvement in completing authorized work orders." *Id.* at 467.

In addition to this framework, this Court in *Al Shimari IV* explained that the military's control must also be actual. *See* 840 F.3d at 156–57. In *Al Shimari IV*, the military, at least on paper, had vast control over the contractors at the Abu Ghraib prison in Iraq where the U.S. military held detainees. *Id.* For example, the contractor fell within the official military command structure, and the military established interrogation rules of engagement and approved interrogation plans. *See id.* But based on the Executive Branch's investigative findings that Abu Ghraib was "plagued by a lack of an organizational chain of command presence and by a lack of proper actions to establish standards and training," this Court concluded that the military lacked actual control over the contractors. *Id.* at 156. "[F]ormal command authority . . . did not translate into actual control of day-to-day interrogation operations." *Id.* The *Al Shimari IV* court also held that the contractor must be engaged in "a lawful action under the actual control of the military," because "the military cannot lawfully exercise its authority by directing a

29

contractor to engage in unlawful activity." *Id.* at 157. In sum, this Court would lack jurisdiction to entertain the Servicemembers' suit if the military's control over KBR was plenary and actual.

2.

Applying these principles, we conclude that the military's control over KBR was plenary and actual. First, the military's control was plenary as it not only directed to KBR "what" must be done but also prescribed "how" KBR must accomplish those tasks. *See Al Shimari III*, 758 F.3d at 534; *Burn Pit III*, 744 F.3d at 338–39. Under the LOGCAP III contract, the military contracted with KBR to provide waste management and water services. The facts found by the district court plainly show that KBR had little to no discretion in choosing *how* to manage the waste. The military mandated the use of burn pits as a matter of military judgment. KBR could not unilaterally choose to use landfills, recycling, or incinerators instead. Additionally, the military exercised plenary control over where to construct the burn pits, what could or could not be burned, when KBR could operate the burn pits, how high the flames should be, and how large each burn should be.

With regard to water services, KBR similarly had little discretion to choose *how* to provide potable water. KBR could not unilaterally bring bottled water from outside of Iraq, as it depended on the military supply chain to transport anything. As the evidence showed, the military directed the frequency and quantity of potable water to be produced and dictated how much should be stored. The fact that KBR lacked discretion

30

differentiates this case from *Taylor* and *Harris*, where the military's control was not plenary because the contractors retained significant discretion, but makes it similar to *Carmichael*, 572 F.3d at 1282, in which "[e]ach of the[] critical determinations was made exclusively by the military." We conclude that the military's control over KBR's waste management and water services was plenary.

Next, the military's control over KBR was actual. *See Al Shimari IV*, 840 F.3d at 156–57. Unlike *Al Shimari IV*, this was not a case involving merely on-paper military control that was plagued by a lack of actual command presence. Although KBR did not officially fall within the military chain of command, the military exercised extensive control and oversight over KBR's burn pit operations and water services. Operationally, the commanders and their staff officers interfaced with KBR contractors on a regular basis. The operational command determined the methods of waste management and water services that KBR was to use, dictated their requirements for support, and directed KBR to provide the necessary services through the contracting arm. The military also retained the ultimate responsibility for testing water quality. Furthermore, the military continuously and meticulously evaluated whether KBR was meeting the commanders' intent. Accordingly, we conclude that the military's control over KBR's waste management and water services was actual and plenary.

### 3.

The Servicemembers raise numerous unpersuasive arguments as to why the military lacked control over KBR. First, the Servicemembers argue that the district court

clearly erred in finding that the military authorized KBR to utilize burn pits across Iraq and Afghanistan. To support this argument, the Servicemembers note that pursuant to LOGCAP III, KBR could not use burn pits without written authorization. Because the record only contains written authorization for burn pits at 18 locations, the Servicemembers argue that KBR therefore did not have authorization for every burn pit. We reject this argument. The district court's factual findings regarding the authorization of the use of burn pits is compelling in light of the entire record, easily surpassing the requirement that we uphold the finding so long as it is simply "plausible." *Wooden*, 887 F.3d at 602 (internal quotation marks omitted). The record overwhelmingly shows that the military not only authorized but mandated the use of burn pits.

In a written declaration, the Servicemembers' own witness, Lieutenant Colonel Damon Walsh, stated that "it is highly improbable that KBR could have located, constructed, and/or operated an enduring burn pit without the awareness and authorization of the military units." J.A. 1077. Likewise, David Palmer, a KBR employee, testified at deposition that he was not "aware of any instances where KBR operated a burn pit without the government's knowledge." J.A. 998. And Matthew Hersch, the military's quality assurance representative, testified that, "in [his] experience at Camp Bucca," there were no "instances where contractors were performing unauthorized work." J.A. 4982–83. Thus, the district court's conclusions that the military decided, authorized, and mandated the use of burn pits at all FOBs and that there were no instances of unauthorized use of burn pits are well supported by the record evidence. In other words, regarding the district court's finding that the military

authorized KBR to use burn pits, the Servicemembers fail to leave a "definite and firm conviction that a mistake has been committed." *Anderson*, 470 U.S. at 573 (internal quotation marks omitted).

Second, the Servicemembers argue that the district court clearly erred in finding that the military exercised any control over KBR because the military—or at least its operational command—cannot directly issue an order to KBR. They argue that only the military's contracting arm could direct KBR through contractual agreements, thus subjecting KBR not to military control but to contractual obligations. This argument is factually and legally unavailing. Factually, though the most immediate control over KBR came from DCMA, DCMA acted at the behest of the operational command. Although part of a separate chain of command, DCMA did not have its own separate mission apart from the operational command; rather, its mission was to support the operational command. This is clear from the fact that DCMA did not have the authority to change the substance of the operational command's requirements. Therefore, we agree with the district court's conclusion that it is "irrelevant here that the military's operational commanders . . . effectuated [their] orders by using DCMA (which is part of the military) as a conduit." *Burn Pit IV*, 268 F. Supp. 3d at 814. Furthermore, as the Army's *Contractor Deployment Guide* shows, "[c]ontractor employees [were] expected to adhere to all guidance and obey all instructions and general orders issued by the Theater Commander or his/her representative." J.A. 812.

Moreover, the Servicemembers' argument is one that places form over substance. *Cf. Al Shimari IV*, 840 F.3d at 157 (noting that, although the military had formal control

33

over the contractor's interrogation tactics, the inquiry turns on "*what actually occurred in practice* during those interrogations" (emphasis added)).  The Servicemembers ask us to abstractly look only to the formal, contractual relationship between the military and KBR while ignoring the actual, operational relationship between them.  We decline to do so.[5]

Third, the Servicemembers argue that the district court's findings regarding the military's control are clearly erroneous because there is evidence of KBR burning hazardous material, despite the military's prohibition against burning such material, thus showing the military did not actually control KBR.  This argument has both factual and legal dimensions.  Factually, the Servicemembers maintain that the district court's finding of control was clearly erroneous.  Legally, the Servicemembers similarly argue that "KBR's repeated violations show a lack of military control over KBR," just like the lack of control in *Al Shimari IV*.  Appellant Br. 39–40.  We reject this argument on both fronts.  Factually, the district court found the allegations that KBR burned hazardous material "vague [and] non-specific" and insufficient to "negate the conclusion that the military retained control." *Burn Pit IV*, 268 F. Supp. 3d at 806.  We find no clear error in

---

[5] Relatedly, the Servicemembers argue that this case is akin to *Taylor*, in which the military lacked plenary control because it had contractually assigned the responsibility of supervision to KBR.  *See* 658 F.3d at 411.  In the Servicemembers' view, because the language of LOGCAP III and the contract in *Taylor* is identical, the military's control over KBR in this case would similarly not be plenary.  We reject this argument.  As noted, *Al Shimari IV*, 840 F.3d at 156–57, requires us to examine what *actually* happened rather than looking to the formal contractual relationship alone.  Given the fact that the military directed KBR's waste management and water services in an extensive and detailed manner, we cannot say that "KBR was nearly insulated from direct military control." *Taylor*, 658 F.3d at 411.

that finding.  And legally, a few instances of non-specific allegations do not amount to the type of systematic failure of oversight and lack of command presence found in *Al Shimari IV*.  In *Al Shimari IV*, there were extensive findings of systematic violations at Abu Ghraib by the Executive Branch.  Here, the Servicemembers make only vague allegations.[6]

For these reasons, we conclude that the district court did not err in determining that the first *Taylor* factor is satisfied.  The military's control over KBR was plenary and actual, making KBR's decisions pertaining to waste management and water services "de facto military decisions" unreviewable by this Court.  *Taylor*, 658 F.3d at 410.  Therefore, we agree with the district court that the political question doctrine bars the Servicemembers' suit.  Because the first *Taylor* factor requires dismissal, we need not discuss the second *Taylor* factor and decline to do so.  *See Burn Pit III*, 744 F.3d at 335.

## IV.

Because this case is nonjusticiable under the first *Taylor* factor, we believe that the proper disposition is to affirm the dismissal and to vacate the portion of the district court's opinion discussing the FTCA issue.  The FTCA waives the United States'

---

[6] The Servicemembers also allege that DCMA was understaffed and poorly trained such that it could not have effectively supervised KBR, thus lacking actual control.  We reject this argument, as the district court's contrary conclusion is well supported by the evidence, and the Servicemembers offer comparatively little evidentiary support for this allegation.  As such, they cannot prevail under clear error review.

sovereign immunity in certain tort cases. 28 U.S.C. § 2674. But under the FTCA's combatant activities exception, the United States remains immune from "[a]ny claim arising out of the combatant activities of the military or naval forces, or the Coast Guard, during time of war." 28 U.S.C. § 2680(j). As relevant here, the combatant activities exception preempts state tort claims against contractors if "a private service contractor is integrated into combatant activities over which the military retains command authority." *Burn Pit III*, 744 F.3d at 351 (quoting *Saleh v. Titan Corp.*, 580 F.3d 1, 9 (D.C. Cir. 2009)). Below, the district court concluded that KBR's activities were integrated into the military's combatant activities. Therefore, the district court held that the FTCA's combatant activities exception preempted the Servicemembers' claims.

As we observed in *Taylor*, 658 F.3d at 412, "because we agree with the district court that the political question doctrine applies here, the second appellate issue— whether [the Servicemembers' claims are] preempted by the FTCA's combat[ant] activities exception—is rendered moot." We decline to review the district court's analysis of the FTCA issue, because the result "would be little more than an advisory opinion . . . ." *Id.* Mindful of our duty to decide only cases and controversies, we will not "stray into the practice of advisory opinion-making, solving questions that do not actually require answering in order to resolve the matters before [us]." *Karsten v. Kaiser Found. Health Plan of Mid-Atl. States, Inc.*, 36 F.3d 8, 11 (4th Cir. 1994) (per curiam). Additionally, we have explained that, in these circumstances, the "customary practice . . . is to vacate the moot aspects of the lower court's judgment." *Norfolk S. Ry. Co. v. City of Alexandria*, 608 F.3d 150, 161 (4th Cir. 2010). Accordingly, we are "obliged to vacate

36

the FTCA ruling, which constitutes the moot aspect of the district court's judgment."

*Taylor*, 658 F.3d at 412.

## V.

For the foregoing reasons, the judgment of the district court is

*AFFIRMED IN PART AND*
*VACATED IN PART.*